# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### May 8, 2012 Session

## STATE OF TENNESSEE v. SHERRI MATHIS

**Appeal from the Circuit Court for Warren County**
No. F-10086      Larry B. Stanley, Judge

**No. M2009-00123-CCA-R3-CD - Filed September 26, 2012**

The defendant, Sherri Mathis, appeals her Warren County Circuit Court jury convictions of two counts of felony murder, *see* T.C.A. § 39-13-202(a)(2) (2006); two counts of aggravated child abuse of a child six years of age or less, *see id.* § 39-15-402(a)(1), (b); two counts of aggravated child neglect of a child six years of age or less, *see id.*; one count of child abuse of a child six years of age or less, *see id.* §39-15-401(a); and two counts of aggravated child abuse, *see id.* § 39-15-402(a)(1).  At sentencing, the trial court imposed an effective sentence of life plus 32 years' incarceration.  In addition to challenging the sufficiency of the evidence on appeal, the defendant claims that (1) the trial court erroneously denied her motion for continuance, (2) the trial court erroneously admitted photographs of the deceased victim, (3) the trial court erroneously denied her motion to dismiss the indictment based upon a fatal variance, (4) the trial court erroneously denied a motion for mistrial, (5) the trial court erroneously allowed the State to call the defendant's civil attorney as a witness knowing that the attorney would claim privilege, (6) the trial court erroneously limited testimony of defendant's expert witness, (7) the State committed prosecutorial misconduct during opening statements and closing arguments, and (8) the trial court imposed an excessive sentence. Additionally, the defendant contends that the trial court erroneously dismissed her petition for writ of error coram nobis and erroneously denied her the right to depose Doctor Bruce Levy concerning the claims contained in the coram nobis petition.  We discern that the trial court failed to merge certain counts and failed to enter judgments as corrected at the hearing on the motion for new trial.  We further conclude that the State failed to establish serious bodily injury with respect to the defendant's convictions of aggravated child abuse in Counts Eight and Nine and direct the trial court on remand to enter judgments reflecting convictions of child abuse and three-year sentences.  Accordingly, the case is remanded for the trial court to enter modified judgments in Counts Eight and Nine, judgments effectuating proper merger, and judgments reflecting modified sentences, and we affirm the judgments in all other respects.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed as Modified;**

**Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and JEFFREY S. BIVINS, JJ., joined.

C. Brent Keeton (on appeal), Manchester, Tennessee; B.F. Jack Lowery, Lebanon, Tennessee; and Michael D. Galligan and John Partin (at trial), McMinnville, Tennessee, for the appellant, Sherri Mathis.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Brian Holmgren, District Attorney General Pro Tempore; and Kristen Menke, Assistant District Attorney General Pro Tempore, for the appellee, State of Tennessee.

**OPINION**

The events giving rise to the defendant's convictions surround the death of six-year-old C.D. and the ensuing investigation concerning the defendant's treatment and care of C.D. and her brothers, ten-year-old R.C. and nine-year-old D.H, while the defendant had custody of the three children from October 2001 until July 2004.[1]

On June 26, 2004, Donald Hillis, a certified first responder, responded to the call of a "child not breathing" at the defendant's home. Because the defendant lived across the street, Mr. Hillis arrived at the defendant's home in "less than two minutes" after receiving the call. As he walked into the defendant's home, he saw "a girl laying in the floor" of the living room while the defendant performed cardiopulmonary resuscitation ("CPR") on the girl. He testified that the victim "was definitely not breathing . . . . She was pale. She was cool." The defendant told Mr. Hillis that the victim had been sick, and he confirmed this report after seeing some "white paste" on the victim indicative of the victim's having vomited or aspirated. He noted that the victim's clothing and hair were wet, and the defendant told him that she had placed the victim in the bathtub in an attempt to revive the victim. When shown photographs of the victim at trial, Mr. Hillis testified that he had seen none of the bruises on the fully-clothed victim when he treated her. He also stated that none of the resuscitative measures undertaken by himself or other medical personnel could have caused the bruises. Mr. Hillis said that the defendant "was very distraught and [that] she was doing all that she could" to help the victim. Mr. Hillis assisted the defendant in her

---

[1] As is the policy of this court, we will refer to the child victims in this case by their initials. For the sake of clarity, we will refer to the deceased victim, C.D., as "victim" and her siblings, who are additional victims, by their initials.

resuscitative efforts and carried the victim to the ambulance when it arrived a few minutes later.

Rachel Miller, a paramedic with the Warren County Emergency Medical Service, arrived at the defendant's home within seven minutes of receiving the call. As the ambulance entered the driveway, Ms. Miller saw Mr. Hillis "carrying a child [who] appeared to be limp." After placing the victim on the stretcher, Ms. Miller and her partner, Preston Denning, continued to perform CPR on the victim while Mr. Hillis drove the ambulance to River Park Hospital. While en route, Ms. Miller attempted to place cardiac monitoring pads on the victim's chest, but the victim was wet and the pads would not adhere to her skin. After drying off the victim and successfully attaching the pads, Ms. Miller "confirmed that [the victim] did not have any kind of electrical activity in her heart." She testified at trial that "at that point[,] the only thing we can do is CPR. We can't defribrillate." Ms. Miller and Mr. Denning attempted to use a "bag-valve-mask" on the victim but had difficulty because water kept coming out of the victim's mouth. Ms. Miller's efforts to intubate the victim were also unsuccessful because "the first thing was when I opened her airway I noticed water was starting to fill her oral cavity again and when I looked a little closer, her oral cavity was full of water and unfortunately I just couldn't see through it to visualize the vocal cords." Ms. Miller recalled that the victim was "very cold to the touch."

Ms. Miller recalled that her partner pointed out bruises on the left side of the victim's face. She also noticed bruising on the victim's abdomen when she removed the victim's shirt to place the cardiac pads. She recalled, "I knew it was not right[,] but I really didn't have time to process it right then. My priority was continuing resuscitation on her[,] but [the bruising] wasn't right." Ms. Miller did not notice any vomit in the victim's mouth or on her clothing. When shown photographs of the bruises and scratches on the victim's body, Ms. Miller opined that none of their resuscitative measures could have caused the injuries. The ambulance arrived at the hospital within six minutes.

Doctor James Parker treated the victim at River Park Hospital on June 26, 2004. The victim arrived at 4:05 p.m. with "no pulse[,] and [she] was not breathing." Doctor Parker recalled that the victim was "very cold" with wet hair and clothing. He testified that the victim appeared "smaller than [he] expected her to be for her age" and that "several markings on her body [] looked like some injuries of various ages." He said that these abrasions and bruises caused him concern "right off the bat." He noted injuries to the victim's lips and gums and "quite a bit of water" in the victim's mouth. He did not notice any vomit. Likewise, he did not notice any crackers in the victim's mouth or airway as a possible culprit of the choking. He opined that placing the victim in the bathtub in an effort to revive her after a choking episode was not an appropriate medical intervention.

-3-

Doctor Parker attempted to revive the victim for 30 minutes, during which time he ventilated her via a vent bag, performed chest compressions, administered medications, drew blood from the victim's femoral artery, and performed X-rays. Noting no electrical activity in the victim's heart throughout this process, Doctor Parker determined that the victim had died at the scene before the paramedics arrived. He pronounced the victim dead at 4:30 p.m. When he approached the defendant to tell her that the victim had died, he recalled that

> it was kind of an unusual situation. When we went out to talk with her to tell her that [the victim] had died, she immediately began to tell me about the injuries [the victim] had on her body, [and I] was kind of struck by that as unusual. She was telling me about the fact that [the victim] would throw herself up against the wall, and that was accounting for all the different injuries that she had . . . . I thought it was an unusual circumstance to give me that information when I was just telling her about the patient dying. I had the nurse with me. Later we commented about how unusual a situation that was.

When Doctor Parker asked the defendant why she placed the victim in the bathtub, he "didn't get a direct answer about that. So, [he] perceived that she was upset and more like fearful and in a panic." He testified at trial that the defendant never appeared "inconsolable" as is typical when a child dies. He recalled that the defendant never cried or expressed any grief over the victim's death.

Doctor Parker testified that toxicology reports from the victim's blood revealed an elevated level of the metabolite from imipramine. He opined that none of the victim's injuries were the result of resuscitative measures or self-injurious behavior. Based upon his observation of injuries of different ages and patterns, as well as the victim's failure to thrive, Doctor Parker suspected the victim had suffered battered child syndrome. Therefore, he contacted the Department of Children's Services ("DCS"), the local police, and the medical examiner concerning the victim's death.

McMinnville Police Department ("MPD") Officer Steven Kohler responded to the call to River Park Hospital. Upon his arrival, hospital staff directed Officer Kohler to the defendant, whom Officer Kohler described as "very emotional." Officer Kohler recalled that the defendant, who had not yet been informed of the victim's death, told him that the victim "had mental health issues and was under the care of a doctor." He testified that the defendant also told him that the victim would "self mutilate[] and drink out of the toilet and dog food bowl." Officer Kohler said that the defendant "was clearly upset about the

circumstances" but did not express any concern for the victim. Officer Kohler later viewed the victim's injuries.

MPD Detective Nicole Mosley also responded to the hospital with a report of "a six year old girl [who] had [reportedly] choked on a cracker, but she was wet." Detective Mosley spoke to the emergency room personnel and photographed the victim's injuries. She then spoke briefly to the defendant. Detective Mosley recalled that the defendant "wasn't as [Detective Mosley] expected her to be. She wasn't crying. She was just kind of standing there when we explained to her that we needed to speak with her." The defendant agreed to meet the detective at the district attorney general's office for an interview later that day.[2] Following the interview, the defendant allowed Detective Mosley and other officers to visit her home and photograph areas pertinent to events on the day of the victim's death. Detective Mosley testified at trial that the defendant cooperated fully with the interview and search of her home. The defendant told Detective Mosley that the victim felt sick on the day she died so she and the defendant stayed inside to watch television.

At her home, the defendant showed Detective Mosley wet areas on the carpet where the defendant had performed CPR. In the kitchen garbage can, the defendant showed Detective Mosley partially chewed crackers that she claimed to have cleared from the victim's throat. Detective Mosley photographed vomit stains on the bathroom carpet, but she did not observe any vomit in the living room. Detective Mosley collected prescription medications administered to the victim. She observed that a 30-day supply had been prescribed on May 21 and that the defendant had refilled the prescriptions on June 16 – 10 days before the victim's death. Detective Mosley noted that only 13 of those pills remained, possibly indicating that the victim had been administered 17 pills in the 10-day time period leading up to her death. Detective Mosley acknowledged that the pill shortage could have occurred by the use of a pill organizer. She also said, however, that the defendant never mentioned using a pill organizer during their interview.

Jason Rowland, an investigator with the district attorney general's office at the time of the victim's death and a Warren County Sheriff's Department deputy at the time of trial, accompanied investigators to the defendant's home on June 26, 2004. He testified at trial that he did not see any vomit in the living room of the home, but he recalled that the defendant told investigators that her mother had come to the home to clean while she was at the hospital. He testified that he watched the June 26 interview of the defendant via closed-circuit television. On July 2, he and Assistant District Attorney General Tom Miner

---

[2] A video recording of the interview was admitted into evidence and played for the jury in its entirety. Although Detective Mosley testified at trial that the recorded interview was an accurate reflection of the defendant's statement, the recording was not included in the record on appeal.

interviewed the defendant once more.[3] Deputy Rowland testified that the defendant voluntarily submitted to the interviews and that she cooperated throughout the investigation. He mentioned, without specifying, that some inconsistencies existed between the June 26 and July 2 statements. He also recalled that the defendant volunteered to have the victim's brothers examined for signs of abuse within days of the victim's death.

Forensic Pathologist Doctor Bruce Levy performed the autopsy of the victim. He testified at trial that the victim's weight "did not change in any significant amount" during the two and one-half years she lived with the defendant. Doctor Levy determined that neither chronic illness nor medication would cause such a failure to gain weight. Doctor Levy opined that the educators' reports that the defendant withheld food from the victim and that the victim was consistently hungry "strongly suggest[ed] a pattern that [the victim] wasn't being provided [for] sufficient[ly] for her to gain weight appropriately." He testified that the victim, therefore, suffered from nonorganic malnutrition. Based upon marks on the victim's neck and hemorrhages to the neck muscles, Doctor Levy determined that the victim died from strangulation. He also observed "a series of injuries sustained . . . over time . . . of various ages" indicative of battered child syndrome. Doctor Levy noted injuries of various stages of healing in areas where accidental injury rarely occurs such as the lower back, backs of legs, and sides of head. He said that bruises found on the victim's lower back and abdomen appeared to have been caused by whipping with a belt.

On cross-examination, Doctor Levy explained that the absence of petechae, minute red or purple spots resulting from localized hemorrhaging, in the victim's eyes or mouth did not preclude a conclusion that the victim died of strangulation because child victims of strangulation, unlike adults, do not routinely exhibit petechae. He also disagreed that marks on the victim's neck could have been caused by the victim's alleged self-injurious behavior. Although he carefully considered the medication levels in the victim's blood, Doctor Levy rejected cardiac arrest brought on by toxicity as a cause of death based upon the "strong evidence" of strangulation. He admitted, however, that the elevated levels indicated one of three things: that the victim had been prescribed more than she should have been, that the victim experienced decreased kidney or liver function, or that the victim "was actually taking more of the drug than was prescribed." He did not find any evidence of decreased kidney or liver function.

DCS Investigator Angelia Bess participated in the investigation of the victim's death. Ms. Bess testified at trial that she possessed some background knowledge of the

---

[3] A video recording of the defendant's July 2 interview was played in its entirety for the jury and admitted into evidence. As is the case with the defendant's June 26 interview, the record on appeal does not include the video recording of the July 2 interview.

victim and her brothers because she had conducted the home study in September 2001 related to the children's initial placement in the defendant's custody. At the time of the 2001 home study, the defendant described the victim as a "crack baby." The defendant also reported concerns about the boys' health and their parents' history, which the defendant believed necessitated human immunodeficiency virus ("HIV") testing.[4] Significantly, in September 2001, the defendant did not report any behavioral problems in any of the children despite what Ms. Bess described as the defendant's preoccupation with the alleged medical issues in the children. Ms. Bess testified at trial that the "children didn't look sickly." During the home study, the defendant indicated opposition to corporal punishment and told Ms. Bess that she would not spank the children. The children, who were ages three, six, and seven at the time, seemed happy at the defendant's home and indicated that they had unlimited access to a "snack drawer" in the kitchen. Ultimately, however, Ms. Bess did not recommend placement of the children in the defendant's home. Nevertheless, following a October 2001 juvenile court hearing, the juvenile court placed the children in the defendant's custody and care. Ms. Bess left DCS employment for some period of time and had recently returned to DCS just prior to the victim's death. She testified that she was "coincidentally" "on-call" on June 26, 2004.

In relation to the investigation of the victim's death, Ms. Bess testified that she interviewed the victim's brothers, R.C. and D.H., at the defendant's home on June 27, 2004. She recalled that the defendant refused to bring the boys to the Children's Advocacy Center for interviews and insisted that the interviews occur at her home while the defendant was present in a nearby room. The defendant reported that the victim suffered numerous "medical or mental disorders" and speculated that the victim might have been "bipolar, [or] possibly schizophrenic."

Ms. Bess reviewed school and health care records and observed reports of "a rapid progression of behavioral problems" including claims that the victim had "eaten out of the commode," experienced sleeplessness and roamed the house at night, threw "screaming fits," injured herself and other children, experienced auditory hallucinations, and played with fecal matter. She noted that the reports of aberrant behavior began in Fall 2001, a short time after the children's placement in the defendant's home, although Ms. Bess neither observed nor received reports from the defendant of such behavior at the time of the home study. Ms. Bess commented at trial, "It did not sound like the same child I had seen

---

[4] The children's biological mother was reputedly a drug addict who regularly resorted to prostitution to support her drug habit. The victim's father, William Delp, had been recently arrested for manufacturing methamphetamine in the home. The defendant had cared for the children in her daycare facility for several years. In preparation of serving his jail sentence, Mr. Delp asked the juvenile court to place the children in the defendant's custody and care.

three years before."

Ms. Bess testified that in October 2001, the defendant no longer had an active foster care license. Thus, she was not entitled to any financial benefits from the State normally allotted to foster parents. Ms. Bess learned that the defendant made similar reports concerning the victim's behavior in support of a disability benefits application concerning the victim in August 2002. Although the defendant's initial application was not approved, the defendant ultimately did receive disability benefits on behalf of the victim.

Following completion of the initial investigation, DCS placed R.C. and D.H. in temporary foster care with Phillip Moffitt on July 2, 2004. On July 6, 2004, Ms. Bess interviewed the boys at the Child Advocacy Center. She testified that she did not advise or speculate with the children about where they would be living following the permanent placement hearing scheduled for July 7. Ms. Bess recalled that R.C. noticed a video camera in the interview room and asked whether the defendant would see the interview. She testified that R.C. seemed concerned about confidentiality, so she told him that the defendant would not see the video recording. Ms. Bess recalled that both children reported that the defendant spanked them with a belt, but neither child mentioned the defendant's choking them. R.C. also discussed the victim's exhibiting some strange behaviors such as "seeing cougars and snakes," "throwing fits," injuring herself, and drinking from the commode. His description of the victim's actions paralleled the defendant's report.

At the July 7 hearing, the defendant agreed to the temporary foster care placement. The juvenile court set an adjudicatory hearing for August 9. At the August 9 hearing, the defendant did not appear, but, through her attorney, she requested "the child support money that she had not been paid" for the children. On cross-examination, Ms. Bess acknowledged that it was not unusual for someone who has custody of a child to seek financial support from the child's parents.

DCS Investigator Peggy Bratcher testified that in April 2001, she initiated dependency and neglect proceedings concerning the children while in the care of the victim's father, William Delp, who Ms. Bratcher described as the children's "primary caretaker." Mr. Delp began compliance with a court-ordered parenting plan with some success until the death of his 19-year-old daughter from an automobile accident. In his grief, Mr. Delp allowed the children to stay with the defendant, who was their daycare provider. Then, near the time of the death of his older daughter, Mr. Delp was arrested for manufacturing methamphetamine.

In August 2001, Ms. Bratcher filed a show cause affidavit concerning Mr. Delp's upcoming incarceration for the manufacturing methamphetamine conviction in order to determine a permanent placement for the children. Mr. Delp asked that the children

remain in the defendant's care. DCS did not recommend placement with the defendant. Nevertheless, in October 2001, the juvenile court awarded custody to the defendant. Soon thereafter, the defendant telephoned Ms. Bratcher to ask when she would begin receiving "board payments" for the care of the children. When Ms. Bratcher told the defendant that the children were no longer in DCS care and that the defendant, as custodian, was responsible for financially supporting the children, the defendant "wasn't happy . . . . [because] [s]he thought that the Department ought to supplement or pay for some of the children's care."

DCS Investigator Doris Denton testified that she received a referral concerning the victim in October 2001. She interviewed the then-three-year-old victim at Brookside Headstart, a preschool program, concerning an injury to the soft palate of the victim's mouth. While at the school, Ms. Denton spoke to the victim's teachers, none of whom reported any unusual behavior by the victim. Ms. Denton also interviewed the victim's brothers, who indicated that the defendant had injured the victim while force-feeding her. When confronted with the children's explanation of the injury, the defendant explained that the victim "got strangled on some corn chips so [the defendant] took her finger to run on down her throat to push the corn chips down her mouth . . . to get her unstrangled." The defendant opined that the boys "misinterpreted" what had occurred.

At the October 2001 custody hearing a few weeks later, the defendant explained that the soft palate injury occurred when she used a "finger sweep" to dislodge a corn chip from the victim's throat. The defendant also testified at the custody hearing that she took the children to have initial medical examinations to ensure they were healthy because their parents were drug users and to protect herself "from allegations that DCS might make against her." The defendant denied requesting HIV testing for the children or making disparaging remarks about their parents. Significantly, at the October 2001 hearing, the defendant described the victim as a happy, healthy, active child and did not report any abnormal behavior.

In December 2001, Ms. Bratcher investigated a complaint concerning the victim's suffering bruises and a severe burn to the nape of her neck. The defendant explained that the victim may have been burned by a curling iron while at the hairdresser in the days before the report. For the first time, the defendant also reported that the victim was being treated by a psychologist for behavioral problems. Although Ms. Bratcher "did not like" the defendant's explanation of the burn injury, she did not believe that the injury "rose to the occasion to petition the court for removal" of the children from the defendant's home. She later learned that the defendant withdrew the victim from the Head Start program the day of the burn injury report.

In November 2002, DCS Investigator Jeffrey Bottoms investigated an allegation of abuse concerning the victim's having a "busted lip." Mr. Bottoms arrived unannounced at the defendant's daycare facility, where he learned that the defendant had "smacked" the victim in the mouth. When confronted by Mr. Bottoms, the defendant told Mr. Bottoms that the victim was schizophrenic and would hurt herself. She also reported that the victim was taking Zyprexa and Clonidine, two adult psychotropic medications, to treat her illness. He eventually closed the investigation of the November 2002 incident after determining that no evidence of abuse existed.

In July 2003, Mr. Bottoms investigated a fourth DCS complaint concerning the defendant's care of the victim after receiving an anonymous report of abuse. During his investigation, he observed scrapes on the victim's neck, a burn on her arm, several small bruises on her legs, and two scabbed scrapes on her lower back. Despite DCS's investigating four complaints in less than two years, the agency found no basis to remove the children from the defendant's custody.

Phillip Moffitt rendered foster care to R.C. and D.H. when they were removed from the defendant's home on July 2, 2004. He testified that when the boys first arrived at his home they "were thin like they hadn't eaten a lot in quite awhile." He remembered that the boys "almost couldn't stop" eating and both gained weight in the first weeks of their stay. Mr. Moffitt was concerned with R.C.'s medications and had him re-evaluated. Afterward, R.C. was able to wean from the attention deficit hyperactivity disorder ("ADHD") medication while in Mr. Moffitt's care. Mr. Moffitt recalled that R.C. eventually began telling him about the abuse he and his siblings suffered from the defendant. He said that D.H. "never really opened up" about the defendant.

Lisa Malloy, the center supervisor of Brookside Head Start, testified that the victim attended their preschool program in Fall 2001. She described the victim as a "typical child" who was active, happy, and played well with other children. She testified that the victim "scored a hundred" on a developmental assessment in September 2001. Ms. Malloy said that each morning as the students came to school, the teachers performed "health checks" on each child. During one such check, a teacher observed bruising on the victim's arms and determined that a DCS referral should be made. Following the report, the defendant withdrew the victim from school. Ms. Malloy said that she never observed any behavioral problems in the victim and affirmed that the victim was not asked to leave the preschool program. She was unaware that one teacher had reported the victim as "hyperactive."

Patty Gilstorf, an employee at Brookside Head Start, observed the victim both at school and occasionally on the school bus. She recalled that the victim arrived at school

one day with "very noticeable bruises on her arms" that were "so startl[ing]" that someone called DCS immediately. Ms. Gilstorf remembered the defendant's "coming and getting [the victim] and she appeared to be angry and was just all but dragging [the victim] out" of the school. Ms. Gilstorf did not witness any unusual behavior from the victim and described the victim as "just a sweetheart." She recalled jokingly telling the defendant once that she would take the victim home with her and being "upset" when the defendant said, "[W]ell you would bring her back. She's a cocaine baby and she hasn't slept a single night since I've had her." Ms. Gilstorf also heard the defendant comment that "the children really have it good now because of where they live."

In March 2002, Joanna Wade worked as a special education teacher for the Warren County school system's preschool program. The defendant asked that the victim be permitted to attend the program "so that she could be watched closer" than in a traditional preschool setting. The defendant reported that the victim would act aggressively toward other children, steal things from other children, "tell lies particularly on [the defendant]," and was prone to overeating and excessive drinking because of her deprived circumstances when in the care of her biological parents. The defendant also reported that the victim was receiving mental health services for reactive attachment disorder. Developmental assessments performed by Ms. Wade and other staff revealed that the victim actually functioned "at or above the levels of [her] peers" in cognitive ability, expressive vocabulary, and visual motor functioning. Based upon the defendant's reports, the victim functioned "below age level or at the same age" as her peers. The victim began attending the preschool program in a full inclusion classroom – a classroom of typical and special needs students – and soon mastered eating with utensils. Ms. Wade did not personally observe any aggressive behavior from the victim.

In October 2002, the defendant asked that the victim be moved to a special education classroom to be watched even more closely. Ms. Wade did not recommend the move because the victim exhibited no language delays and all of the other children in the room presented significant language delays. Nevertheless, Ms. Wade testified that the defendant insisted on the move based upon her "extensive experience" in the daycare setting. Ms. Wade recalled that the victim ate appropriately, fed herself, toileted independently, and exhibited no behavior warranting placement in a special education classroom. From October 17, 2002, until January 29, 2003, teachers observed injuries on the victim on four separate occasions: once the victim came to school with stitches on the top of her head reportedly caused by another child at the defendant's daycare facility, once the victim had bite marks on her nose and left forearm, once the victim had a swollen lip reportedly caused by the victim's "sucking" on her lip (this injury was referred to DCS and investigated by Mr. Bottoms), and once the victim came to school with an injury on her tongue reportedly caused by an ice cube. Immediately after the school nurse inquired about the tongue injury, the

-11-

defendant removed the victim from the preschool program.

A few months later, in May 2003, the defendant again contacted Ms. Wade about re-enrolling the victim in the preschool program. At a meeting to determine the victim's placement, the defendant reported that the victim was not potty-trained, could not feed herself, and did not sleep. Ms. Wade disagreed with the defendant's assessment of the victim, which she said caused "a lot of tension" at the meeting. Ms. Wade testified at trial that she saw no signs of disability in the victim and that the victim performed "very typical[ly] for other three and four-year-olds" while in the full inclusion classroom. Ms. Wade also recalled that the victim never showed any signs of insomnia such as irritability or recalcitrance. Despite the lack of corroboration of the defendant's accounts, Ms. Wade ultimately agreed to place the victim in the special education classroom. Ms. Wade no longer worked for the preschool program in Fall 2003 when the victim returned and, therefore, had no knowledge of the victim's performance.

Debra Odineal, a school psychologist with the Warren County school system, evaluated the victim in February 2002 when the defendant first sought special education services for the victim. As part of the assessment, Ms. Odineal reviewed a behavioral rating completed by the defendant. She also performed independent testing of the victim. On the behavioral rating, the defendant indicated that the victim was prone to hyperactivity, aggression, and tantrums. Ms. Odineal's independent assessment of the victim, however, showed that the victim was "very cooperative, . . . [she] seemed to enjoy the individual attention" of the evaluation, and she was able to complete the evaluation in one session, which was unusual for a child her age. Ms. Odineal determined that the victim performed "[v]ery much in the average range." Significantly, the "F-index" – an indicator on the evaluation which measures the "rater's tendency to describe a child's behavior in an overly negative way" – indicated that the defendant's report should be considered with "extreme caution." Ms. Odineal explained, "In other words, the behavior might not be as severe as was indicated" by the defendant. Ms. Odineal recalled that information from other preschool programs did not corroborate the defendant's report. Ultimately, Ms. Odineal determined that the victim qualified for some special education assistance "[b]ased upon a developmental delay in personal social skills and social adaptive skills," but she recommended the victim be placed in a full inclusion classroom. She testified, however, that the victim would not have qualified for special education services without the defendant's report and that, based upon the severity of the reports, one would expect to see the victim's behavior exhibited in multiple settings.

Cheryl Hitchcock taught in a full inclusion preschool classroom in the Warren County preschool program from 2001 until 2003. The defendant contacted Ms. Hitchcock in December 2001 seeking the victim's placement in the program and reported that the victim

had been recently "kicked out" of the Brookside Head Start program due to behavioral problems. The defendant reported that the victim was being treated for reactive attachment disorder and exhibited aggressive and self-injurious behavior necessitating special education services. The victim attended Ms. Hitchcock's classroom, where Ms. Hitchcock noted, "[I]t was difficult to keep her on task[, but] I did not observe the behaviors that I had been warned about." Ms. Hitchcock recalled that the defendant was concerned that the victim was overeating and drinking water excessively while at school. In fact, the defendant asked that the victim's food and water intake be restricted. Because breakfast was an important aspect of class socialization, Ms. Hitchcock admitted that she did not heed the defendant's requests. When the defendant requested that the victim be moved to a special education classroom, Ms. Hitchcock did not think it was necessary because the victim functioned well in the full inclusion classroom.

In May 2002, Ms. Hitchcock completed a "Teacher Questionnaire" for the Social Security Administration concerning the victim. In it, she noted that the victim had some difficulty sharing or taking turns but that her behavior was not unusual or unmanageable. She also noted that the victim was easily "re-directed" when discipline issues arose. Ms. Hitchcock did not observe any aberrant behavior in the victim. At trial, Ms. Hitchcock testified that the victim "was a delight to be around as far as wanting to interact. She was always very talkative. . . . She was easy to re-direct if we needed to re-direct her to another activity." Regarding the defendant's report of the victim's behavior, Ms. Hitchcock testified, "She indicated to me that the behaviors were much more severe than what I observed."

Ms. Hitchcock testified that she saw the victim and the defendant once after the victim had left the preschool program. When she went to greet them, she recalled the defendant's saying in front of the victim that "she didn't know why anyone would be glad to see [the victim] because of the way she acted sometimes." Ms. Hitchcock recalled that the victim would not make eye contact with her and "was very still and quiet" as she and the defendant talked.

Tanya Woodlee worked via a practicum in Ms. Hitchcock's full inclusion classroom while the victim attended the preschool. She described the victim as "a very bubbly child" who was "right on track as far as her development, her speech, any interaction. She was your typical, normal, three year old child." Ms. Woodlee testified that Ms. Wade and Ms. Hitchcock had asked her to pay special attention to the victim's behavior, and she never observed any aberrant behavior from the victim. Ms. Woodlee noted, however, that the victim was regularly thirsty. She testified, "As soon as [the victim] would sit down at the table the first thing she would do was just drink as fast as she could and she would throw that hand up with her cup asking for more drink." Ms. Woodlee testified that another staff

member asked her to limit the victim's intake of food and water.

Shannon Jacobs taught the self-contained special education class while the victim attended the preschool. At the planning meeting for the victim's move to her classroom, the defendant reported that the victim could not go to the bathroom alone, would drink out of the toilet, would eat feces, displayed violent outbursts, and suffered from reactive attachment disorder. The defendant also warned the teachers that the victim would lie about being injured at school. Although Ms. Jacobs asked for medical releases concerning the victim's care, she never received any diagnosis from a treating physician. Ms. Jacobs testified at trial that the victim was "much higher functioning than most of the children in [her] class," and she opined that the victim never should have been placed in a special education classroom. Once an additional teacher was hired, the victim was moved to another special education classroom with "higher functioning" children. Ms. Jacobs testified that the victim was kindergarten-ready when in her classroom despite some cognitive delays.

Susan Pryor worked as a teaching assistant to Ms. Wade in 2002. She observed the children each morning. She testified at trial that she never noticed any unusual behavior in the victim other than "she was thirsty. . . . She asked for drinks more frequent[ly] than the other children." Ms. Pryor recalled that the defendant asked the teachers to withhold food and drink from the victim out of concerns about overeating and bed-wetting. Ms. Pryor recalled, however, that the victim always ate appropriate portions of food. She also recalled that the victim's behavior was "age appropriate," and she believed that the victim's "being in [her] classroom was not appropriate for the skills [the victim] had."

Ms. Pryor observed injuries on the victim on more than one occasion. She observed stitches on the victim's scalp and bites to her nose. A badly bruised lip prompted a DCS referral. On January 8, 2003, Ms. Pryor noticed an injury to the victim's mouth where "her tongue and the roof of her mouth appeared where the skin had actually been torn off." Ms. Pryor said that she was concerned the injury may be thrush, so she took the victim to the school nurse, Jill Brock. After Ms. Brock telephoned the defendant to ask about the injury, the defendant sent an employee to the preschool to pick up the victim. Ms. Pryor said the victim never returned to school.

In Spring 2003, Ms. Pryor saw the defendant and the victim at a local ballfield. She recalled that the victim

> was not the bubbly little girl that we had in daycare. She was
> very subdued. She was sitting in the grass with . . . another
> child. . . . She stared into space. There was no interaction with

-14-

the other child. She appeared, from my observations, to where she may have been sedated.

Ms. Pryor testified that while in her class, the victim

was very bubbly. She always had a smile on her face. She talked with the teachers. She made eye contact with the teachers. She would talk to other students and play. She was very typical, very typical four year old[,] and when I saw her that spring it was like a different child.

Jill Brock, a nurse for the Warren County school system, examined the victim on January 8, 2003, regarding a sore on the victim's mouth that the teachers were concerned was thrush. She testified that she "did not think it was thrush at all." She said the sore was a raw abrasion to the victim's tongue and soft palate. When Ms. Brock telephoned the defendant to inquire about the injury, the defendant "quickly told [her] that she had already been to the emergency room and seen a doctor for it but offered no other explanation." Ms. Brock testified that she telephoned the defendant because the victim required medical care beyond what she could provide at the school. She recalled that the defendant "wasn't happy" about the telephone call.

Angela Crick worked for the defendant in her daycare facility from 1998 until June 2002. She testified that the victim and her brothers began attending the daycare facility when the victim was an infant. She said that the victim attended full-time until beginning preschool, and then the victim attended only in the afternoons. Ms. Crick testified that the victim grew without difficulties. She acknowledged that at times the victim had difficulty "participating with others" and would wander off, but she said that was not unusual for the victim's age. Ms. Crick observed no unusual behaviors in the victim and described her as "a sweet little girl [who] tried to fit in." She said, "I did see her throw a couple of fits and have a hard time interacting, but she was a small child." When presented at trial with a developmental assessment listing myriad behavioral problems, Ms. Crick acknowledged her signature on the form, but she denied filling out the form. She claimed that the defendant filled out the form and asked her to sign it and that she had never completed a form like that.

Doctor Regina Reuter, a pediatrician, treated the victim from September 5, 2001 until October 5, 2001. At the initial visit, the defendant told Doctor Reuter that the victim's father was in jail for drugs and that her mother was in jail for drugs and prostitution. The defendant reported this history in the victim's presence, which Doctor Reuter found "not acceptable." Doctor Reuter determined that the victim "was a well child." At the defendant's request, she performed HIV testing and urinalysis, based upon the defendant's

-15-

claims about the victim's parents and report of the victim's urinary frequency, but she said that all the tests came back "fine." Doctor Reuter also checked the victim for a bleeding disorder because she observed "bruising on the [victim's] upper limbs and lower limbs and the chest." She recalled that the blood test results were also normal.

On October 3, 2001, Doctor Reuter treated the victim for a cold. At that time, the bruising had healed. On October 5, 2001, the victim returned because her cold symptoms had worsened. During the examination, Doctor Reuter observed an injury to the victim's soft palate. She questioned the defendant and received no explanation. Outside the defendant's presence, she questioned the victim's brothers about the injury. The boys told her that the defendant "put [the victim] down on her back flat. She controlled [the victim's] body with her two knees and she shoveled the food with the spoon in her throat." The boys also told Doctor Reuter that the victim cried during the incident. Based upon their explanation, she reported the injury to DCS.

Doctor Reuter testified that there was no treatment for the soft palate injury other than "time to heal." She determined that the injury was "caused by a blunt, hard object," not a finger sweep. Doctor Reuter testified, 'I don't really believe there is [an] accident that can happen inside your mouth. So it was on purpose injury." Doctor Reuter testified that the victim did not exhibit any aberrant behavior at any of the appointments. Following the DCS report, the defendant changed pediatricians. When asked at trial about the medications subsequent physicians prescribed to the victim, Doctor Reuter commented, "That cannot be explained on any medical basis." She further explained that she saw no signs of "major psychiatric problem[s]" to require prescribing such "extreme drugs" at such a young age.

Doctor Cynthia Rowe Young, a psychologist with Centerstone Mental Health Center, treated the victim from November 2001 until June 2002. Doctor Young testified that the defendant sought mental health treatment for the victim in November 2001 and that the defendant provided the intake information due to the victim's age. At the intake appointment, the defendant reported the victim's biological parents' criminal behavior and described herself as "upper middle class" with training in daycare operations and therapeutic foster care. The defendant told Doctor Young that the victim suffered severe sleep disturbances, forgot skills if not used daily, was both hyperactive and overactive, had screaming fits 10 to 12 times a day, would pull her own hair and bite herself, would dip toilet paper in the commode and eat it, and had "boundary problems" with other children. Doctor Young preliminarily diagnosed the victim with reactive attachment disorder – a mental health disorder often suffered by children of neglect or abuse marked by extreme difficulty or extreme ease in forming parental attachments. Doctor Young explained that children with reactive attachment disorder will either "attach to no one" or will attach "quickly and easily"

"to anybody." Doctor Young recommended the victim be examined by Doctor Clifford Seyler, a pediatrician who specialized in ADHD and bipolar disorder in children.

At a December 6, 2001 appointment, the defendant updated the victim's behavior and reported that the victim had been "throwing fits" at school that interfered with her ability to learn. The defendant also reported that the victim was experiencing difficulty with peers who were "shunning" her because of the behavior and that the victim was getting hurt at school. Based upon this report, Doctor Young recommended the defendant remove the victim from Brookside Head Start because the victim's needs could not be met in a traditional classroom. Doctor Young testified that she would not have recommended the victim's changing schools had she known that there were no behavioral problems occurring at school. Likewise, Doctor Young was unaware of both the soft palate and burn injuries investigated by DCS in Fall 2001.

After two missed appointments in December 2001 and early January 2002, the victim's next appointment occurred on January 28, 2002. At that appointment, the defendant reported that the victim would repeatedly stick herself with a needle "in a way that an IV drug user would do." Thus, the defendant suspected the victim's parents were using drugs in front of the children during visits.

The victim missed two more appointments. On April 1, 2002, the victim told Doctor Young that she was sad her parents could not care for her but happy the defendant was helping until her parents became able. At the April 1 appointment, the defendant and Doctor Young discussed the possibility that the victim suffered from bipolar disorder. Doctor Young testified that a bipolar diagnosis in a four-year-old child would be unusual, so she sought the advice of Doctor Seyler. At the last appointment on June 13, 2002, the victim seemed to be doing well on her medications. Doctor Young recalled that the victim was "difficult" to treat, so she referred her for other mental health therapy at that time. She admitted that she never received any educational records concerning the victim and that she relied solely on the defendant's reports concerning the victim's unusual behavior. She also testified that the victim always seemed well cared for, and she never observed any signs of abuse.

Psychiatrist Saran Madumbe treated the victim from April 2003 until her death. Doctor Madumbe "tried to involve the other people [in the victim's treatment] . . . , but they never came." Consequently, the only information Doctor Madumbe relied upon consisted of the defendant's reports and appointments with the victim, which generally occurred in the defendant's presence. The defendant told Doctor Madumbe that the victim had difficulty playing with other children, had been expelled from school, and acted impulsively, disruptively, and aggressively with her peers. When the victim first began seeing Doctor

-17-

Madumbe, the defendant indicated that they had discontinued therapy sessions because "the therapist gave up because [the victim] was not getting any better." Doctor Madumbe diagnosed the victim with attention deficit disorder, reaction attachment disorder, and major depression. He did not, however, diagnose her with schizophrenia or bipolar disorder.

After the first appointment, Doctor Madumbe prescribed to the victim Strattera (for ADHD), imipramine (for anxiety, depression, and bed-wetting), and Risperdol (for paranoia and aggression). At the next appointment, Doctor Madumbe increased the dosage of imipramine based upon the defendant's report that the victim was experiencing continued symptoms of depression and bed-wetting. Doctor Madumbe also prescribed Benadryl to be taken in conjunction with Seroquel to decrease the victim's insomnia. At the time of her death, the victim was prescribed 50 milligrams each of imipramine and Seroquel and 75 milligrams each of Risperdol and Benadryl.

Doctor Madumbe explained that he increased the dosages during her care because the victim "continued to have behavior problems in school and at home. . . . We know that the medicines are not FDA approved [for pediatric use, and w]e have to at any point when a kid is increasing medicines, we continue monitoring." For this reason, he performed initial cardiac testing on the victim and ordered periodic tests throughout treatment. He testified, however, that his file did not contain any additional tests. For this reason, he questioned whether the defendant had taken the victim to her pediatrician for monitoring and testing as he had directed throughout her care.

Doctor Madumbe testified that imipramine can show up in blood work in its metabolite form, despramine. He said that normal levels ranged from "150 to 300," with higher levels creating an adverse side effect of "increased heart rate with palpitations." He believed that it was "unrealistic, but not totally ruled out" that the victim would die from toxicity of her medications after being on them for over a year. He characterized the level revealed from River Park Hospital's toxicology screen as "definitely abnormal." He also opined that if the victim had not been truly experiencing the symptoms reported by the defendant, he would not have initiated treatment and that the medications would have produced side effects.

Pat Williams, a registered nurse with the Warren County Health Department, testified that the defendant brought the victim to her office in September 2001, February 2002, and October 2002 to receive Women, Infants, and Children (WIC) benefits which included nutrition counseling and growth charting. Ms. Williams observed the victim to be "a well behaved child" at each visit. At the initial visit in September, the victim weighed 29.25 pounds. In February, she weighed 31 pounds, which Ms. Williams described as "average weight gain." In October, however, the victim only weighed 31.5 pounds, which

Ms. Williams described as "inadequate." Ms. Williams recalled that the defendant told her that the victim was taking several medications to treat schizophrenia and had been suspended from school. She never observed any abnormal behavior during the victim's visits and commented that parents "[v]ery, very rarely" disclosed that a child the victim's age had schizophrenia.

Vanderbilt University Psychiatrist Erin Fowler conducted an evaluation of the victim's brothers several weeks after the victim's death and their removal from the defendant's custody. R.C. told Doctor Fowler that "every time [the victim] got in trouble it got worse and worse." R.C. also reported that the defendant disciplined him and his siblings more often than her biological children. He said that the defendant's punishments included "whipping" with a belt, choking, kicking, throwing things, and washing their mouths out with soap. R.C. also said that the defendant had warned them to "not tell a damn thing about what happen[ed] in [her] house." Doctor Fowler testified that R.C. was taking Ritalin, Clonodine, Zoloft, and Trazodone and that she eventually began weaning him from the medications because "he was not in need" of them. She recalled that R.C. wanted to be off the medications because he believed they "reflected on his normalcy."

Doctor Fowler testified that D.H. was more hesitant to discuss living with the defendant. He did, however, report that the defendant would whip and choke them. During one particular incident, the defendant choked D.H. until he almost passed out. D.H. described the defendant's force-feeding him, saying, "She made me eat until I puked and then she made me eat one more bowl after I puked." D.H. recalled that on the day of her death, the victim received "two whippings and had to drink vinegar because she drank out of the dog bowl."

Doctor Fowler opined that a schizophrenia diagnosis in a child the victim's age would be "very unusual." When confronted with the absence of references to choking in the boys' statements to investigators, she explained that "[m]any children in abusive situations are intimidated and afraid of the consequences of reporting about the abuse and they don't share it because of that."

Robbie Roberson worked at the Hamilton County Child Advocacy Center in 2004 and counseled the victim's brothers following the death of the victim and their removal from the defendant's home. Ms. Roberson met with the boys on five separate occasions in preparation for the removal adjudication hearing in August 2004. R.C. told Ms. Roberson that the defendant verbally abused, hit, choked, and spanked him and his siblings. He said he was "scared to death." He also told Ms. Roberson that the victim "was treated more badly than the other children." D.H. reported similar abuse and recalled that the defendant "whipped" the victim twice on the day of her death.

R.C., 13 years old at the time of trial, testified that he began living with the defendant when William Delp, the victim's father and the children's care giver at the time, went to jail. He said that he knew the defendant because he and his siblings attended her daycare facility. He recalled that the defendant had two daughters and a son. The defendant's daughters shared a room, her son had a room of his own, and R.C. and D.H. shared a room. R.C. testified that the victim slept in a sleeping bag on the defendant's bedroom floor.

Initially, R.C. enjoyed living with the defendant, but his opinion quickly changed because the defendant began whipping them with a belt. R.C. was unable to say how many times the defendant beat them. He described that the beatings progressively worsened as they lived with the defendant and said that the defendant would swing "wildly" when she was "angry." He testified,"[S]he would whip me and then she would choke me. She would put her hands around my neck and pin me up against the wall." He described that the defendant would hold him until he "stopped breathing and then she would let go." He said, "I was scared. I thought I was going to die because I couldn't breathe." R.C. recalled the defendant's choking D.H. once until D.H.'s face "turned white." He testified that he began taking medication for ADHD after the defendant took him to a psychiatrist. He did not believe he had ADHD and stopped taking the medication after leaving the defendant's home.

Although R.C. did not see the defendant beat the victim, he did hear it. He recalled that the victim would scream. He said the victim always had bruises from the beatings. He recalled that the defendant would not allow the victim to feed herself and that the defendant would force feed the victim "pretty much every time she ate." He said he even witnessed the defendant's forcing the victim to eat her own vomit once. Once when he came home from school, he noticed the victim's face was badly bruised, and the defendant told him that the victim had thrown herself from a moving car. He said that the defendant would withhold fluids from the victim when she wet the bed, which would cause the victim to drink from the dog bowl. When the victim drank from the dog bowl, the defendant then forced her to drink pickle juice as punishment.

R.C. testified that he and his siblings were not allowed to sit on the defendant's couch. He said that much of the abuse occurred when the defendant's husband was at work. He also stated that he never reported the abuse because the defendant "told [them] if [they] ever told on her she would kill [them]." He acknowledged that he never told any teachers, counselors, or DCS investigators about the abuse. He testified that he never witnessed any abnormal behavior from the victim, other than "throwing fits," and that any behavior he reported to investigators he had learned about through conversations with the defendant.

-20-

D.H., 12 years old at the time of trial, testified that he now lives with his father, William Delp. He recalled going to live with the defendant because his parents were in jail. He said that his younger sister died while they lived with the defendant. He recalled that he got along "[p]retty well" with the defendant until she began giving the children "whoopings whenever we didn't really do anything." He said that the defendant would whip them with a belt and that "it hurt every time [he] sat down." He saw her spanking her own children once and often heard her spanking his siblings. D.H. said that he lied to his friends about marks and bruises on his neck because he was "afraid that whenever [he] got home that [the defendant] might hurt [him]."

D.H. testified that the victim would scream and cry when the defendant whipped her. He said that the victim always had scratch marks on her neck from the defendant's choking her. He never saw the victim injure herself, but he did see the victim "throw fits." He testified that once the defendant followed the victim to the bathroom and returned with a "clump" of the victim's hair in her hand, claiming that the victim had pulled her hair out herself. He said that the defendant would feed the victim because the victim "wouldn't eat fast enough." He remembered that the defendant would sometimes jab the fork into the victim's mouth or tongue. On the day of the victim's death, D.H. recalled that the victim had vomited and that her face looked "green."

William Delp, D.H. and the victim's biological father, testified that he cared for R.C., D.H., and the victim until he went to jail in August 2001. In 2001, the children's mother was "out of the picture," and Mr. Delp wanted the defendant to have custody of the children in his absence because "she had been taking care of them since they were babies and [he] trusted her at that time." Before he left to serve his jail sentence, Mr. Delp enrolled the victim in the Brookside Head Start program. He recalled that when the victim enrolled she was potty-trained, could feed herself, put on her shoes, and knew her colors. He further stated that she had none of the behavioral problems reported by the defendant within months of going into the defendant's care. Mr. Delp was not aware that the defendant made disability applications on behalf of the victim and R.C., despite his working for the defendant's father from May 2001 until June 2005 and maintaining some contact with the defendant and the children. He said that he paid $70 weekly in child support to the defendant and allowed the children to remain in the defendant's care after the service of his jail sentence because he "was in no position at the time to take care of [his] three kids." Mr. Delp recalled that the children never reported anything about the defendant during visits, but "[a] couple of times somebody would start to say something and . . . the kids would say, no, we're not supposed to talk about that."

John Covey learned that he was R.C.'s biological father while R.C. was in the defendant's care. He recalled paying the defendant "[m]aybe a hundred dollars a week" as

child support when he first learned of his paternity. He later paid the defendant $650 monthly before gaining custody of his son. When the defendant told Mr. Covey that R.C. "was in trouble on the streets for stealing food," Mr. Covey sent his son food. He testified that his son never received the food or gifts that he sent. He was not aware that the defendant had applied for disability benefits on behalf of R.C. and that, in the application, the defendant claimed that R.C. had no interested parents. He testified that R.C. came to live with him and his family in California within months of the victim's death. He further stated that he had R.C. evaluated in California, where doctors determined R.C. did not suffer from ADHD and removed him from his medication.

Kristy Hickerson taught the victim in her special education classroom in 2003. She testified that the victim met the criteria for a self-contained classroom due to both cognitive and behavioral delays. She recalled that the victim had "trouble transferring skills from one setting to another" and displayed a lack "of concern for her own safety." Ms. Hickerson said that the victim would frequently throw tantrums, injure herself, and play with water in the bathroom. The victim attended Ms. Hickerson's classroom for approximately four months until late January 2004 when, according to Ms. Hickerson, a psychiatrist recommended that the victim withdraw from school until her behavioral problems could be controlled. In a disability form filled out by Ms. Hickerson, she noted, "[The victim] is a very challenging child as many of her problems are not evident on the surface. Working with her brings new challenges each and every day. Without much improvement, in my opinion it is doubtful that she will ever gain an adequate level of independence." Ms. Hickerson never suspected that the victim was being abused. When confronted at trial with photographs of significant bruising on the victim's back, she explained that the victim could have injured herself by falling.

Mary Lou Hunter testified for the defendant that she worked as a teaching assistant in Ms. Hickerson's special needs classroom where the victim attended preschool in 2003. Ms. Hunter noticed that the victim exhibited "[a] lot of outbursts. A lot of self-mutilation, scratching. She had bathroom problems. . . . A lot of tantrums on the floor [during which] . . . [s]he would throw herself down and tip over chairs and get down on the ground." She testified that the victim would pinch herself and other children, bang her head on the table, and bite herself. She admitted, however, that the victim's tantrums were "probably not" any different than those of other children in the classroom. Ms. Hunter did not recall any restrictions to water or food imposed by the defendant. She testified that she never suspected that the defendant was abusing the victim. She recalled that the victim often had bruises on her arms or legs. When shown photographs taken on the day of the victim's death, Ms. Hunter testified that she had seen "[n]othing like this on her back."

Pharmacist Mary Woodley testified that she filled prescriptions for the

defendant's family for many years. She recalled filling prescriptions to the victim for imipramine, quantipine, Benadryl, Risperdol, and Seroquel and characterized these drugs as "dangerous." She noted that the defendant "was always very concerned. She was always very timely. She never asked for [the prescriptions] ahead of time." Ms. Woodley observed the defendant with her children, including the victim, numerous times and never observed any unusual behavior. She testified, "The only thing I thought was unusual was she always had several children with her and they were always well behaved."

Tammy Jennings, the defendant's family friend, testified that when the victim "was bored" she "would sit and rock back and forth like she was consoling herself." She recalled that the victim would "pick" at her arms and neck when "she wasn't getting the attention that she wanted or if she didn't get what she wanted." Ms. Jennings witnessed the victim's tantrums on three occasions and described that the victim would "flail" to the ground if she did not get her way. She recalled seeing the victim pull the defendant's hair, pull her own hair, and kick or push her siblings or other children. Ms. Jennings testified, however, that she never helped the victim use the bathroom. She characterized the victim's tantrums as unusual because "[her] children didn't do that." She also said of the victim, "She was a very loving child and she was very well behaved, but if she wanted something or she did not feel like she was getting the attention she deserved, she would act." Ms. Jennings never saw the defendant physically discipline the victim. She testified that the defendant would instead verbally reprimand the victim and put her in time-out.

Sandra Cantrell, a registered nurse whose grandchildren attended the defendant's daycare facility, would often see the victim during daycare. She testified that the victim was always loving and would want a hug. She recalled the victim's "picking at herself" but said she never observed any injuries from this behavior. She observed no other unusual behavior from the victim.

Centerstone counselor Mark Spaargaran treated R.C. and D.H. in late 2001 and early 2002. He testified that the boys attended sessions with either the defendant or Mr. Delp, but he said that he would speak to the boys individually and privately during their sessions. He said that the boys never disclosed any maltreatment by the defendant and seemed to like living with the defendant. On cross-examination, he testified that the defendant reported the victim's mental health issues as more severe than the boys and that she consistently made negative statements about the children's biological parents in front of the children. Mr. Spaargaran was not aware of any DCS investigations involving injuries to the victim.

Jennifer Jones, a hair stylist and friend of the defendant, testified that the victim "knew no danger" and would "hang[] off" the back of salon chairs when the defendant

brought the children to her salon. She said that the victim required constant supervision. She admitted writing a letter to the editor of the local newspaper following the defendant's indictment wherein she vouched for the defendant's loving care of the victim and her brothers. Ms. Jones said that nothing would change her opinion of the defendant as a caring and dedicated mother.

The defendant's son, Josh Mathis, who was 21 years old at the time of trial, testified that the victim would see "snakes and tigers," throw tantrums, pinch herself, and pull her own hair. He recalled that the victim's behavior often caused bruises and scratches. He testified that the victim's brothers would regularly lie and blame one another if one of them misbehaved. He testified that the defendant whipped him but never choked him. On cross-examination, he admitted that he was 14 years old at the time of the victim's death and that he spent a lot of time in the basement alone. Consequently, he conceded that he may not have witnessed the whippings suffered by the victim and her brothers. He could not recall whether the defendant whipped him with a belt. Mr. Mathis testified that he believed the defendant was falsely accused.

T.M., the defendant's older daughter who was 16 years old at the time of trial, testified that the victim "was normal but she would have fits and stuff." She recalled that the victim would pinch or claw her neck until it bled and then pick the scabs. T.M. testified that the victim could feed herself. Likewise, T.M. was not aware that the victim had any problems with using the bathroom independently. T.M. said that the defendant spanked her with a belt once but never choked her. T.M. never saw the defendant spank the victim, R.C., or D.H., but she knew that the defendant would spank the children with a belt in the master bedroom. On the day of the victim's death, T.M. returned home from a trip to Gatlinburg to find the victim and the defendant sitting on the couch watching television. T.M. went outside with her little sister and the boys. Later, she heard the defendant screaming and came inside to see the defendant administering CPR to the victim, who had vomited. At the defendant's request, T.M. telephoned her grandmother who arrived later and cleaned the areas where the victim had vomited.

B.M., the defendant's younger daughter, who was 12 years old at the time of trial, recalled that the victim "would throw a lot of fits" for no reason. She testified that the victim would hit her head against the wall, claw herself, and throw herself to the floor. B.M. said that the defendant would put the victim "in the corner" often for time-outs and that the victim would scream during time-outs. She said that the defendant would utilize either time-outs or spanking with "a small leather belt" as discipline and that all of the children were treated the same. B.M. said that the defendant "never whooped us hard" and did not choke any of them.

-24-

Robert Mathis, the defendant's husband, testified the victim wandered at night and seemed to hallucinate at times. He recalled finding the victim under his bed once and acting like she was "physically trying to wrestle something" in her sleep. He said that during tantrums the victim would "grit her teeth and you would think she was going to explode or something." He explained, "You would just have to try to calm her down until she got over it." Mr. Mathis testified that he never spanked the victim, but he admitted that he did spank R.C. and D.H. He never saw the defendant spank or choke any child and claimed that the defendant "would give them verbal directions and discipline." He could not recall many spankings, claiming "[t]hat is not something that we do around our house." Mr. Mathis claimed that the victim often had scratches and bruises, but none were abnormal. When shown photographs of the victim's injuries, he claimed "[t]hose types of bruises were common on her."

The defendant testified that the victim, R.C., and D.H. began living with her and her family when Mr. Delp asked her to care for them in his absence while he served a 130 or 140-day jail sentence. She recalled that when the children arrived in her care, they "weren't clean. They weren't provided for. They needed a lot of help." The defendant said that R.C. "couldn't concentrate [and] was kindly nervous [but] . . . very, very loving." She said that D.H. was "an excellent child . . . so loving . . . always happy [and] perfect." The defendant described the victim as " a beautiful little girl . . . the most open loving child with problems." The defendant said that after Mr. Delp signed over guardianship of the children to her, DCS "caught wind of it" and "stepped into the picture" because DCS wanted to place the children in foster care. Ultimately, the juvenile court determined that the children could remain in the defendant's care. The defendant testified that following the juvenile court hearing, "I was told by the Department of Children's Services, you won in [c]ourt, so these children are your problem, you deal with it." She said that the children soon lost TennCare benefits because the defendant could not qualify based upon her household income. Unfortunately, the children were ineligible for her husband's insurance because they were not biological or adopted children.

The defendant took the children to Centerstone for evaluation and counseling in compliance with the juvenile court's order. Doctor Young recommended the defendant take the children to Doctor Seyler for pediatric care. Doctor Seyler, in turn, recommended the defendant take the victim to Doctor Madumbe for pediatric psychiatric care. The defendant testified that she had no formal medical training other than first aid and CPR and that she learned everything about the children's mental health issues from either doctors or prescription literature.

The defendant testified that she never interfered with the parents' visitation with the children. She did admit, however, instructing their mother of the need for

consistency because their mother was "in and out" of their lives based upon her employment or relationships. The defendant said at trial, "I was praying that their parents would realize how special these children were and would get them back." She denied having any intention of adopting the children. Furthermore, the defendant denied ever abusing the victim or her brothers.

The defendant testified that, on the day of the victim's death, the day "started off okay" until the victim began complaining of a stomach ache. The defendant admitted whipping the victim for drinking out of the dog bowl but claimed she "didn't whip her hard." The defendant painted the victim's toenails, and the victim took a nap. After her nap, the victim began feeling better. The defendant gave her some crackers to eat while watching television. The defendant sat nearby reading a book. At one point, the victim looked like she had too many crackers in her mouth so the defendant told her to get up and spit them out before she choked. The defendant said that the victim stood up and "stumbled backwards." The defendant testified concerning what happened next:

> I thought she was choking because she started going limp on me. I was trying to hold her up over the garbage can and clean out her mouth. She was like biting down on me. I placed her on the couch when I thought I had all the crackers out of her mouth. I went in the kitchen and got a washrag and a cup of water. I washed her face off. She was making a noise. I was trying to get her to drink some water because I thought that she still had the crackers in her mouth. I got a little bit of water down her, but it was like she was looking at me and she was making a noise, but it wasn't [the victim]. I grabbed her up and r[a]n through the house and put her in the garden tub in my bathroom. I turned the water on and I was trying to throw the water up on her face thinking the water would wake her up. She wasn't unconscious or anything like that, but when I placed her in the bathtub, I started throwing the water up on her. It was like her head slumped down. She wasn't responding to me. So, I grabbed her out of the bathtub and put her on the rug. I couldn't tell if she was breathing, so I started CPR.

The defendant said that the victim began vomiting during CPR. She said that at one point the victim began coughing, so she "rolled her over on her side" and telephoned 9-1-1. During her call to 9-1-1, the defendant told the operator, "I think my child ha[s] passed

away."[5]  Mr. Hillis soon arrived and assisted with CPR.  The defendant testified that she cooperated fully with the investigators and the prosecutor's office.  She explained that she had filled up a seven-day pill planner on the morning of the victim's death, accounting for the shortage of pills in the prescription bottles.

On cross-examination, the defendant testified that any inconsistencies that occurred in her statements and testimony were the result of her misunderstanding the questions being asked.  Likewise, the defendant claimed that Ms. Bratcher was mistaken about the defendant's October 2001 inquiry about "financial support" and explained that she only telephoned DCS to find out about insurance coverage for the children.  She further claimed that she sought disability benefits for the victim and her brothers in an effort to obtain insurance benefits.  The defendant denied completing teacher assessment forms and having employees sign them in furtherance of her seeking disability benefits.  The defendant disavowed responsibility for seeking child support payments and claimed that the State instituted the child support proceedings independently on her behalf.

The defendant denied force-feeding the victim, and she claimed that R.C. and D.H. were never interviewed by Doctor Reuter regarding the victim's soft palate injury in October 2001.  She also said that R.C. and D.H. were mistaken about her withholding food and blamed the victim's lack of weight gain on her medications.  The defendant reported that she suffered from an inoperable brain tumor and did not have the strength to spank the victim more than "two or three smacks on the bottom."  As for the victim's injuries at the time of her death, the defendant claimed that the abdominal bruises were caused by the family dog stepping on the victim a week before her death and that the back bruises were caused when the victim "pitched a fit" during daycare the day before her death.  The defendant expressed her belief that the boys "have been talked to quite a bit" and "have been coached very well."  She affirmed that she was "an absolute outstanding caretaker" to the children.

Pediatrician Clifford Seyler testified for the defendant as an expert in pediatric medicine, strangulation, and child abuse.  He reported that he treated the victim from January 23, 2002, until her last visit on February 6, 2004.  He recalled that at the initial appointment the defendant reported a "history of being excessively active, being self-abusive" that was "compatible with a deranged child."  At his office, however, the victim's "demeanor was different.  Her affect was flat.  She had no interaction."  Doctor Seyler explained that he "never established a relationship with [the victim] because she had a difficult time apparently attaching to people."  He opined that the victim "was a complex case and she fit into many categories.  She fit ADHD.  She fit conduct disorder.  She fit oppositional defiance disorder

---

[5] The 9-1-1 tape recording was made an exhibit at trial and played for the jury.  Unfortunately, it is not included in record on appeal.

and the problem was there were so many comorbid things going on with the child." He explained that as the victim "became more and more obviously manic" her self-injurious behavior increased. He recalled seeing "a lot of bruising which was consistent with mania but not bruising consistent with child abuse." Ultimately, Doctor Seyler referred the victim to Doctor Madumbe for treatment "[b]ecause none of the medications that [he] was using with her w[ere] working."

Regarding the day of the victim's death, Doctor Seyler understood that the victim awoke with nausea and later in the day began vomiting crackers and became nonresponsive. He opined that attempts to intubate the victim were "ill advised" and could have caused the damage to the victim's neck. He disagreed "completely" with Doctor Levy's conclusion that the victim died from strangulation. He explained that the victim evidenced no petechae which, in his opinion, precluded a diagnosis of strangulation. He opined instead that the victim "died as a result of toxic reaction to the medications she was on." He noted that the victim's blood work indicated that she was "severely ill" on the day of her death and that her medications were "waiting in the background" to exacerbate her cardiac reactions to her illness and cause her death.

On cross-examination, Doctor Seyler acknowledged that the victim's diagnosis and treatment rested on the accuracy of the defendant's reports concerning her behavior. He admitted that he would not have utilized the same treatment had he known the information was inaccurate. Likewise, he admitted that he never reviewed any educational information and, therefore, never received any information indicating that the defendant had exaggerated the victim's symptoms. Significantly, he also admitted that he never witnessed any of the reported behaviors in his office. When confronted with photographs taken at the time of the victim's death, he said that he had never observed injuries like those shown in the hospital photographs. He admitted, however, that some of the bruises appeared to be accidental while others would indicate abuse absent any adequate explanation. He further opined that the bruises were inconclusive because the victim suffered from an illness that caused her to bruise easily.

When Doctor Seyler was confronted with photographs that he took documenting bruising on the victim in 2003, the following exchange took place:

> **Doctor Seyler**: I don't know how you do it but you get the worst possible look out of the pictures that you take. This is not at all what this picture looks like. This is a terrible example of this picture.

> **District Attorney**: Well, Doctor, actually these were the

-28-

photographs you took personally.

**Doctor Seyler**: I took the photographs personally and I can tell you that does not look like the photograph that you have on the screen. Something is happening when you transmit [the photograph] to make it look that bad.

Doctor Seyler then admitted that he performed testing on the victim in 2003 to determine whether she suffered from a disorder causing her to bruise easily. The test results were normal.

Clinical Pharmacologist Opless Walker testified for the defendant as an expert in pharmacology, toxicology, psychopharmacology, and cause of death. He determined that the victim was prescribed a salicylate (Pepto Bismol), diphenhydramine (Benadryl), guanfacine (Tenex), imipramine (Tofranil), quetiapine (Seroquel), and ripseridone (Risperdol). He said that only the Pepto Bismol and imipramine were approved for pediatric use at the time of the victim's prescription and, therefore, no pediatric dosage information accompanied the other drugs.

Although imipramine was approved for pediatric use, Doctor Walker characterized it as "the most dangerous drug of the bunch." He said that the approved dosage of imipramine for a child the victim's size was 37.5 milligrams daily. Consequently, he determined that the victim "was receiving on a daily basis one-third more imipramine than the maximum allowed dosage." He further explained that the victim did not suffer an overdose of imipramine but instead experienced an accumulation of desipramine, a metabolite of imipramine, which added to the increased risk of toxicity. He determined that the Risperdol, Seroquel, and imipramine interacted to further increase the risk of cardiotoxicity. Doctor Walker opined that "somebody failed that child" by not ensuring that monthly cardiac testing and blood work were conducted and that the victim's death could have been prevented by adequate monitoring.

On cross-examination, Doctor Walker admitted that he did not review the photographs showing the extensive bruising suffered by the victim at or around the time of her death. He only reviewed pharmaceutical records and laboratory reports in arriving at his opinion. Although nothing in the autopsy report indicated that the victim had suffered cardiac arrest brought on by toxicity, he affirmed his belief that the victim had, in fact, died from cardiotoxicity. He acknowledged that the victim tolerated the dosage of medications for over a year, but he said that "you never know when a drug is going to get you."

With this evidence, the defendant rested her case. Following arguments of

counsel, instruction by the trial court, and deliberations, the jury convicted the defendant of the following offenses:

| Count One | First Degree Murder via Aggravated Child Abuse | C.D. | 06/24/04 |
|---|---|---|---|
| Count Two | First Degree Murder via Aggravated Child Neglect | C.D. | 06/24/04 |
| Count Three | Aggravated Child Abuse | C.D. | 06/24/04 |
| Count Four | Aggravated Child Neglect | C.D. | 06/24/04 |
| Count Five | Aggravated Child Abuse via a deadly weapon, a belt | C.D. | 06/24/04 |
| Count Six | Child Abuse | C.D. | 06/01/04 – 06/24/04 |
| Count Seven | Aggravated Child Neglect | C.D. | 10/01/01 – 06/24/04 |
| Count Eight | Aggravated Child Abuse | R.C. | 6/16/03 – 6/25/04 |
| Count Nine | Aggravated Child Abuse | D.H. | 6/16/03 – 6/25/04 |

At sentencing, the trial court imposed a life sentence for each first degree murder conviction (Counts One and Two), a sentence of 22 years' incarceration for each aggravated child abuse and aggravated child neglect conviction concerning the victim (Counts Three, Four, Five, and Seven), a sentence of 3 years' incarceration for the child abuse conviction (Count Six), and sentences of 10 years' incarceration for the aggravated child abuse convictions concerning R.C. and D.H. (Counts Eight and Nine).  The trial court ordered counts one through six to be served concurrently with one another (total effective sentence of life imprisonment) and counts eight and nine served concurrently with one another (total effective sentence of 10 years' incarceration).  The court further ordered that each aggregate group be served consecutively to one another and to the aggravated child neglect in Count Seven, resulting in a total effective sentence of life plus 32 years' incarceration.

At the motion for new trial hearing, the trial court agreed that any increase beyond the statutory minimum to the lengths of the defendant's sentences would result in a violation of the defendant's Sixth Amendment rights.  Accordingly, the trial court reduced each 22-year sentence to 20 years, the three-year sentence to two years, and each 10-year sentences to 8 years.  The court did not, however, modify the alignment of the sentences.

-30-

The total effective sentence then became life plus 28 years' incarceration.[6] The trial court denied the defendant's motion for new trial in all other respects. The defendant then filed a timely notice of appeal to this court.

On June 7, 2010, during the pendency of her direct appeal in this court, the defendant filed a petition for writ of error coram nobis in the trial court alleging that Doctor Levy's March 16, 2010 arrest for possession of marijuana qualified as newly discovered evidence entitling her to a new trial. On October 5, 2010, this court stayed the proceedings in the direct appeal pending resolution of the coram nobis claim in the trial court. On August 26, 2011, following the State's pleading that the statute of limitations barred the defendant's coram nobis claim, the trial court dismissed the coram nobis petition, in part, as time-barred and also denied the defendant the right to depose Doctor Levy regarding his alleged addiction to and use of marijuana at the time of the victim's autopsy and the defendant's trial. The defendant filed a timely notice of appeal from the trial court's summary dismissal. The direct appeal from the convictions and sentences and coram nobis appeal are now properly before this court.

On direct appeal, the defendant challenges the sufficiency of the evidence to support her convictions. Her sufficiency claim is three-fold: that there is insufficient evidence establishing (1) that the defendant caused the victim's death (Counts One and Two), (2) that the defendant abused R.C. or D.H. during the time period encompassed in the indictment (Counts Eight and Nine), and (3) that the belt, as employed in this case, constituted a deadly weapon (Count Five). Additionally, the defendant claims that (1) the trial court erroneously denied her motion for a continuance, (2) the trial court erroneously admitted prejudicial photographs of the deceased victim, (3) the trial court erroneously denied her motion to dismiss the indictment based upon a fatal variance, (4) the trial court erroneously denied a motion for mistrial, (5) the trial court erroneously allowed the State to call the defendant's civil attorney as a witness knowing that she would claim attorney-client privilege, (6) the trial court erroneously limited the testimony of an expert witness regarding a new diagnosis that contributed to the victim's death, (7) the State committed prosecutorial misconduct in opening statements and closing arguments, (8) the trial court erroneously imposed an excessive sentence in violation of the defendant's Sixth Amendment rights, and (9) cumulative errors deprived her of her right to a fair trial. The State contends that the evidence sufficiently established the defendant's guilt of the convicted offenses and that the convictions should be affirmed. We will address the defendant's direct appeal issues before addressing the issues related to the coram nobis petition.

---

[6] As we will discuss later in our analysis of the defendant's sentencing challenge, the record does not contain any amended judgments reflecting the trial court's modifications at the motion for new trial hearing.

*I. Sufficiency of the Evidence*

We review the defendant's claims of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

First degree murder, as charged in this case, includes "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse [or] aggravated child neglect." T.C.A. § 39-13-202(a)(2). The criminal code provides that, in establishing felony murder, "[n]o culpable mental state is required for conviction under subdivision (a)(2) . . . , except the intent to commit the enumerated offenses or acts in those subdivisions." *Id.* § 39-13-202(b).

"A person commits the offense of aggravated child abuse or aggravated child neglect who commits the offense of child abuse or neglect as defined in § 39-15-401 and . . . [t]he act of abuse or neglect results in serious bodily injury to the child." *Id.* § 30-15-402(a)(1). "Child abuse" is committed by "[a]ny person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." *Id.* § 39-15-401(a). "Child neglect" is committed by "[a]ny person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare." *Id.* § 39-15-401(b). Specifically to Count Five, "[a] person commits the offense of aggravated child abuse . . . who commits the offense of child abuse . . . as defined in § 39-15-401 and . . . [a] deadly weapon is used to accomplish the act of abuse." *Id.* § 39-15-402(a)(2).

-32-

*A. Cause of Death*

The defendant posits that "there was no direct evidence that [she] committed the crime that led to [the victim's] death and that the case is based on circumstantial evidence." She further disputes the sufficiency of the convicting evidence in light of what she characterizes as the countervailing evidence establishing that the victim died from cardiac toxicity brought on by medication. She claims that

> causation of the death of the [victim] was the critical issue in this matter. There was conflicting testimony as to the cause of death in this matter and the cause of bruising on the child. It was not proven beyond a reasonable doubt that the [d]efendant killed the [victim].

The State contends that sufficient evidence exists establishing that the victim died as a result of strangulation and that she suffered a pattern of abuse throughout her stay in the defendant's care. The State further argues that the evidence established that the defendant perpetrated the abuse.

Initially, we note that the defendant erroneously contends that "[w]hen a case involves circumstantial evidence, such as in the case at bar, different standards apply." In *Dorantes*, our supreme court clarified the standard to be utilized when examining circumstantial evidence and held "that direct and circumstantial evidence should be treated as the same when weighing sufficiency of such evidence." *Dorantes*, 331 S.W.3d at 381 (citations omitted) (also noting that "[c]ircumstantial evidence . . . is intrinsically no different from testimonial evidence"). Therefore, even assuming the evidence in this case consisted entirely of circumstantial evidence, the evidence would not be held to a greater level of scrutiny as espoused by the defendant.

In this case, experts testified regarding the substantial bruising found on the victim's body at the time of her death. Doctor Levy's examination revealed bruises of varying stages of healing, which occurred in the days leading up to the victim's death. Each expert agreed, to varying degrees, that some of the victim's injuries could not have been caused accidentally. Doctor Levy concluded that the victim suffered from battered child syndrome and that she ultimately died from strangulation. Additional testimony established that the resuscitative efforts of medical personnel did not cause the victim's injuries to her neck. Ms. Miller observed the injuries on the victim's torso when attempting to place the cardiac pad on the victim and immediately concluded that "the bruising [on the victim's body] wasn't right." Although the defendant's experts testified that the victim died from cardiotoxicity caused by her medication, the jury accredited the testimony of the State's

-33-

witnesses concerning the cause of death and the events leading up to the victim's death, as was their province to do. In our view, the evidence sufficiently established the victim's cause of death as strangulation.

The testimony of all the witnesses, including the defendant's family, showed that the defendant meted out the majority of the discipline in the household. R.C. and D.H. both testified that the victim routinely beat them with a belt and that, on occasion, she would push them up against a wall and choke them. Both boys testified that the victim suffered the most severe discipline and abuse at the defendant's hands. They also testified that the defendant spanked the victim on the morning of her death. In our view, the evidence sufficiently established that the victim died at the hands of the defendant.

Furthermore, testimony concerning the defendant's failure to seek medical treatment and her withholding of nourishment from the victim culminated in the victim's suffering from "nonorganic malnutrition" at the time of her death. Also, on the day of her death, the evidence established that the defendant delayed calling 9-1-1, opting instead to place the victim in a tub of water in an attempt to revive the victim, an unreasonable option in light of the defendant's purported first aid and CPR training. Also, the defendant's placing the victim in the bathtub complicated resuscitative efforts by making it difficult or impossible for medical personnel to intubate the victim. Medical personnel testified that the victim's body temperature seemed cooler than it should have been had the defendant sought medical attention as soon as the victim experienced cardiac arrest. Accordingly, we conclude that sufficient evidence exists to support the defendant's convictions of felony murder via aggravated child abuse (Count One), felony murder via aggravated child neglect (Count Two), aggravated child abuse on the day of the victim's death (Count Three), aggravated child neglect on the day of the victim's death (Count Four), felony child abuse in the month leading up to the victim's death (Count Six), and aggravated child neglect extending throughout the victim's stay with the defendant (Count Seven).

*B. Aggravated Child Abuse of R.C. and D.H.*

The defendant next argues that the evidence failed to establish that she committed aggravated child abuse of the victim's brothers within the time specified in the indictment. The State argues that R.C. and D.H. each testified concerning specific instances of aggravated child abuse within the time of the indictment.

Counts Eight and Nine of the indictment in this case allege that the defendant committed aggravated child abuse against R.C. and D.H., respectively, sometime between June 16, 2003 until June 25, 2004. We observe that this time frame limited the counts to aggravated child abuse with the victim's being over six years of age, according to the ages

-34-

of R.C. and D.H. We also observe that the State was not required to prove with any specificity the date the abuse occurred.

The defendant's convictions of aggravated child abuse as to R.C. and D.H. required the State to establish that the boys suffered serious bodily injury at the hands of the defendant. "'Serious bodily injury' means bodily injury that involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." *Id.* § 39-11-106(34).

Our supreme court recently addressed the level of proof required to establish serious bodily injury by showing a substantial risk of death. In *State v. Michael Farmer and Anthony Clark*, No. W2009-02281-SC-R11-CD (Tenn. Aug. 22, 2012), a case involving a gunshot wound to the victim's thigh, the supreme court held "that in determining whether there was a 'serious bodily injury' based on a 'substantial risk of death,' [a reviewing court] must look to the injury that occurred rather than the injury that could have occurred or the manner in which it occurred." *State v. Michael Farmer and Anthony Clark*, ___ S.W.3d ___, No. W2009-02281-R11-CD, slip op. at 6 (Tenn. Aug. 22, 2012). Here, there was no proof that either R.C. or D.H. suffered any injury that carried with it a substantial risk of death.

In *Michael Scott Farmer*, the court, citing with approval this court's opinion in *State v. Sims*, 909 S.W.2d 46 (Tenn. Crim. App. 1995), concluded that the level of pain necessary to establish serious bodily injury via extreme physical pain "must be enough to be in the same class as an injury which involves a substantial risk of death, protracted unconsciousness, protracted or permanent disfigurement or the loss or impairment of the use of a bodily member, organ or mental faculty." *State v. Sims*, 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995). In *Sims*, this court held that the pain associated with the injury to Sims's victim, a broken nose, did not qualify as "extreme physical pain" for purposes of the definition of serious bodily injury. Based upon the ruling in *Michael Scott Farmer*, we conclude that neither boys' testimony supports a finding that the boys suffered pain to the degree necessary to qualify as serious bodily injury.

Moreover, although both boys testified that the defendant had choked them until they "stopped breathing" or "passed out," neither testified that their loss of consciousness lasted for more than a brief period. Given its natural and ordinary meaning, "'[p]rotracted' is an adjective used to describe something that is delayed or prolonged in time." *State v. Derek Denton*, No. 02C01-9409-CR-00186, slip op. at 10 (Tenn. Crim. App., Jackson, Aug. 2, 1996) (citing *Merriam Webster's Collegiate Dictionary* 939 (10th ed. 1994); *American Heritage Dictionary* 568 (1975)). Because no proof established the duration of either boy's loss of consciousness, the State failed to establish that R.C. or D.H.

suffered serious bodily injury by a protracted loss of consciousness.

Finally, no proof established that either R.C. or D.H. suffered "[p]rotracted or obvious disfigurement" or "[p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Because the State failed to establish that R.C. or D.H. suffered serious bodily injury, we conclude that the State failed to establish the necessary elements of aggravated child abuse with respect to each victim. The proof does, however, support convictions for child abuse. Accordingly, on remand the trial court shall enter modified judgments reflecting convictions of child abuse and imposing three-year sentences in Counts Eight and Nine.

## C. Belt as Deadly Weapon

In her last argument attacking the sufficiency of the evidence to support her convictions, the defendant contends that the belt, as utilized in this case, did not qualify as a deadly weapon relative to her conviction of the aggravated child abuse of the victim on the day of her death in Count Five. The State asserts that the evidence sufficiently established the defendant's conviction in this count.

As the term is used in this case, a deadly weapon is "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Witnesses testified that the victim would scream when the defendant beat her with the belt. D.H. said that even though he was not beaten as often or as hard as the victim, he was unable to sit down after having been beaten with the belt by the defendant. Doctor Levy testified that the victim's lower back and buttocks showed layers of bruises of varying ages consistent with having been beaten by a belt not only on the day of the victim's death but also on the days leading up to her death. In our view, evidence that the victim endured beatings so ferocious that they caused her to scream in pain and so frequent as to leave her with layers of bruising sufficiently established that the victim suffered extreme physical pain from beatings inflicted with the belt. Accordingly, we conclude that the belt, in the manner it was deployed against the victim, qualified as a deadly weapon and that sufficient evidence exists to support the conviction in Count Five.

## II. Merger of Offenses

Having determined that the evidence is sufficient to support the defendant's convictions, we now address an issue not raised in the defendant's brief concerning the trial court's failure to merge offenses. We note that the felony murder convictions should have merged. *See State v. Cribbs*, 967 S.W.2d 773, 788 (Tenn. 1998) ("Obviously, when only one person has been murdered, a jury verdict of guilt on more than one count of an indictment

charging different means of committing first degree murder will support only one judgment of conviction. . . .”). Furthermore, under the statute in effect at the time of the offenses, the offenses of child abuse and child neglect were “a single offense which a defendant may commit ‘through one of two courses of conduct: child abuse through injury and child abuse through neglect” with the additional element of serious bodily injury or use of a deadly weapon. *State v. Mateyko*, 53 S.W.3d 666, 668 n.1 (Tenn. 2001) (citing *State v. Hodges*, 7 S.W.3d 609, 622 (Tenn. Crim. App. 1998)). Therefore, the convictions in Counts Three, Four, and Five, all alleging different courses of conduct constituting the same offense, should have been merged.[7] On remand, the trial court shall enter judgments properly effectuating the merger of offenses as outlined in this opinion.

### III. Denial of Motion to Continue

Next, the defendant argues that the trial court’s denial of her motion to continue based upon the unavailability of a defense expert witness deprived her of a fair trial. The State contends that the trial court properly denied the defendant’s third motion to continue made less than two weeks before the trial date.

“[T]he granting or denying of a continuance is a matter which addresses itself to the sound discretion of the trial judge.” *Moorehead v. State*, 409 S.W.2d 357, 358 (Tenn. 1966) (citing *Bass v. State*, 231 S.W.2d 707 (Tenn. 1950)). An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied the defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted. *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995) (citing *State v. Wooden*, 658 S.W.2d 553, 558 (Tenn. Crim. App. 1983)). “The burden rests upon the party seeking the continuance to show how the court’s action was prejudicial. The only test is whether the defendant has been deprived of his rights and an injustice done.” *State v. Goodman*, 643 S.W.2d 375, 378 (Tenn. Crim. App. 1982) (citing *Baxter v. State*, 503 S.W.2d 226, 228 (Tenn. Crim. App. 1973)).

On February 7, 2008, the defendant sought a continuance of the February 19 trial date because her forensic pathologist, Doctor Sanford Edberg, had recently undergone surgery and was unable to travel from his home state to testify at trial. She also moved for a continuance due to her own reportedly poor health. In denying the defendant’s motion for a continuance, the trial court determined that other defense experts were prepared to testify and offer testimony similar to Doctor Edberg’s testimony. The trial began, as scheduled, on

---

[7] The predicate offense convictions, however, do not merge into the first degree murder convictions. Separate convictions for those offenses are appropriate. *State v. Godsey*, 60 S.W.3d 759, 775-78 (Tenn. 2001).

February 19.

The defendant argues that prejudice occurred because she was unable to present an expert in forensic pathology to rebut the testimony of Doctor Levy concerning the victim's cause of death. The record reflects, however, that the defendant presented substantial testimony from Doctors Seyler and Walker concerning the cause of the victim's death and their opinions that the victim died as a result of cardiac toxicity related to her medications. Likewise, the defendant offered detailed testimony at trial concerning her care of the victim, R.C., and D.H., and her actions on the day of the victim's death. Therefore, we conclude that the defendant failed to establish any prejudice arising from the trial court's denial of a continuance and that the trial court did not abuse its discretion.

*IV. Admission of Photographs*

The defendant argues that the trial court erroneously admitted photographs of the deceased victim taken at the hospital on the day of her death and at the autopsy. She contends that admission of the photographs was inflammatory, prejudicial, and unnecessary to Doctor Levy's testimony and explanation of his findings relative to the cause of death. Also related to the admissibility of the photographs, the defendant alleges that the prosecutor "visibly cried" when presenting the photographs for the first time during trial. She claims that the prosecutor's reaction to the photographs established that the photographs were inflammatory and prejudicial and that the trial court erred by admitting them. The State argues that admission of the photographs was necessary to explain the extent of the victim's injuries occurring over time culminating in her death and that the photographs were not unfairly prejudicial.

The admissibility of photographs is governed by Tennessee Rules of Evidence 401 and 403. *See State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). Under these rules, the trial court must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; *Banks*, 564 S.W.2d at 949. Next, the trial court must determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951. Photographs offered by the State must be relevant to prove some part of its case and must not be admitted solely to inflame the jury and prejudice it against the defendant. *Id.* Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. *Banks*, 564 S.W.2d at 949; *see also State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); *State v. Allen*, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

The trial court considered the admissibility of the photographs at a pretrial hearing. At the hearing, Doctor Levy testified to the relevance of each photograph in its depiction of the injuries suffered by the victim. He explained the necessity of the photographs to convey the differences between accidental trauma and non-accidental trauma suffered by the victim. Likewise, he said that the photographs showed injuries at various stages of healing relevant to his determination that the victim had suffered from battered child syndrome. Through Doctor Levy's testimony, the State also established the photographs' relevancy to rebut the defendant's claims that the injuries resulted from resuscitative measures undertaken by medical personnel.

Following the trial court's thorough review of each photograph, the court determined

> They are not attractive. They are pictures of a dead child, a child that has passed. I think they would be necessary according to Dr. Levy's testimony to more accurately describe the injuries and would be certainly beneficial with the color photographs to show what he is trying to show and I don't think they were taken to be overly dramatic but they are what they are and I will allow them for that purpose.

In our view, the photographs were relevant to the extent of the victim's injuries, the ages of her injuries, and to rebut the defendant's claim that some of the injuries occurred during resuscitative measures. The photographs, while numerous, are not redundant and only show the sheer number of bruises discovered and documented on the victim's body. Furthermore, the mere fact that a photograph might evoke some emotional response does not automatically preclude its admission. We agree with the trial court's characterization – "they are what they are" – and conclude that the relevance of the photographs was not substantially outweighed by the danger of unfair prejudice posed by their admission. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the photographs.

## V. Variance

The defendant argues that a fatal variance exists between the date of the victim's death as alleged in the indictment and the date of her death as proven at trial. She contends that the variance is fatal because, had she been acquitted, nothing would have prevented the State from seeking a new indictment alleging the correct date of the victim's death. The State argues that the variance in the dates was neither material nor prejudicial and, therefore, cannot be considered fatal.

The record reflects that during Deputy Rowland's testimony concerning his interview of the defendant the trial court interrupted the presentation of proof, saying "If I may interrupt, you mentioned a couple of times the date of June 26th?" The prosecutor then responded, "Is that not the date?" Realizing then that the indictments alleged the date of death as June 24, the State moved to amend the indictment to allege the correct date of the victim's death, June 26. The defendant, via Tennessee Rule of Criminal Procedure 7, refused to acquiesce to the amendment, arguing that jeopardy had already attached and that the variance in dates was fatal. The trial court initially allowed the amendment without the defendant's permission, but the court later reversed itself and denied the State's motion to amend. The court also ruled that the variance was not fatal. At the motion for new trial hearing, as on appeal, the defendant reiterated her claim that a fatal variance occurred.

"A variance between an indictment . . . and the evidence presented at trial is not fatal unless it is both material and prejudicial." *State v. Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000) (citing *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984); *State v. Ealey*, 959 S.W.2d 605, 609 (Tenn. Crim. App. 1997)). A variance will not be considered fatal when "the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *Moss*, 662 S.W.2d at 592. Generally, unless the matters alleged in the indictment are essential elements of the crime, they may be disregarded in analyzing the sufficiency of the convicting evidence. *Church v. State*, 333 S.W.2d 799, 809 (Tenn. 1960).

Tennessee Code Annotated section 40-13-207 provides that "[t]he time at which the offense was committed need not be stated in the indictment . . . unless the time is a material ingredient in the offense." T.C.A. § 40-13-207. Furthermore, "the offense may be alleged to have been committed on any day before the finding of the indictment, or generally before the finding of the indictment." *Id.*

The defendant has failed to establish that a fatal variance exists between the indictment in this case and the proof at trial. First, the date of the offense is not an essential element of the offenses charged. Therefore, the date "is immaterial and can be omitted from the indictment." *State v. Taft Arkey Murphy*, M2007-00403-CCA-R3-CD (Tenn. Crim. App., Nashville, Oct. 27, 2008), *perm. app. denied* (Tenn. Mar. 23, 2009) (citing *State v. Shaw*, 82 S.W. 480 (Tenn. 1904); *State v. West*, 737 S.W.2d 790, 792 (Tenn. Crim. App. 1987)). Furthermore, because it was not material, the State was not limited in its proof to the date alleged in the indictment. *West*, 737 S.W.2d at 792. We also determine that the variance did not mislead or otherwise hamper the defendant's ability to present a defense, and we further observe that no confusion existed concerning the date of the victim's death and the time frame of the victim's stay in the defendant's custody as it related to the charges in the

-40-

indictment. Accordingly, we conclude that the defendant is not entitled to relief based upon a claim of variance.

*VI. Mistrial*

The defendant argues that the trial court erred by denying her motion for mistrial based upon the prosecutor's allegedly crying during the first presentation of photographs of the deceased victim. The State contends that the trial court observed the prosecutor and found that she was not "visibly crying" and that the trial court correctly denied the motion for mistrial.

The record reflects that the prosecutor presented the photographs of the victim's injuries for the first time during the State's direct examination of Ms. Miller. At a bench conference, the defendant voiced concerns that the prosecutor "was audibly and visibly crying in front of the jury" during presentation of the photographs. The trial court stated

> It's a legitimate question. . . . I heard her take a deep breath. She paused for a minute to form a question. I offered to take a recess. She said, no, I'm fine. We went on. I don't think it was – even if the jury did see her do that or take a breath or need a minute, you know, but I didn't take it as anything that was obviously prejudicial.

Defense counsel then said, "I saw tears in her eyes." The trial court ruled, "I had a better angle at the front of her and I didn't see it so note your objection." The court then recessed the trial for the evening. On the following morning, before resuming proof, the defendant moved for a mistrial. Her motion was two-fold: (1) that the prosecutor's crying caused prejudice to the trial and (2) that the prosecutor's crying established the inflammatory and prejudicial nature of the photographs, giving credence to the defendant's claim that the photographs should have been excluded pursuant to Rule 403. The trial judge denied the motion for a mistrial, stating that the prosecutor had "no tears in her eyes and I was looking right at her." The court also declined to revisit the issue of the photographs' admissibility.

The decision to grant a mistrial is an issue entrusted to the sound discretion of the trial court. *See State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). The burden of establishing the necessity for mistrial lies with the party seeking it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some

event has occurred which precludes an impartial verdict." *Id.* On appeal, this court will disturb a trial court's denial of a motion for mistrial only when there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990); *Williams*, 929 S.W.2d at 388. An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)); *see also State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

In the present case, the trial court determined that the prosecutor did not cry in front of the jury and that any brief expression of emotion did not prejudice the trial. Consequently, the trial court denied the motion for mistrial. From the record before this court, we cannot discern any abuse of discretion in the trial court's denial. Accordingly, we conclude that the defendant is not entitled to relief on this issue.

## *VII.  Attorney Privilege Claim*

The defendant argues that the trial court erroneously allowed the State to call the defendant's civil attorney, Lena Buck, as a witness at trial to testify regarding her representation of the defendant in civil proceedings concerning the victims, knowing that Ms. Buck would claim attorney-client privilege. In essence, the defendant posits that the trial court should have precluded Ms. Buck's testimony and that Ms. Buck's claim of privilege in front of the jury prejudiced her trial.

The record reflects that when the State called Ms. Buck to testify, she immediately refused to answer any questions, including disclosing whether she represented the defendant in juvenile court proceedings concerning the victims, and claimed attorney-client privilege. Following an in-chambers conference that included a conference telephone call with the Board of Professional Responsibility, the trial court ruled that the information sought by the State was protected by attorney-client confidentiality rules and refused the State's motion to compel Ms. Buck to testify. Once the trial resumed, the trial court instructed the jury, "I have ruled that the prior attorney for the defendant in the Juvenile Court proceeding may not be compelled to testify. . . . when you hire an attorney . . . anything involved in that representation is confidential."

The State correctly notes that the defendant failed to support her argument with any citation to authorities. For this reason, we could treat this issue as waived. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by the argument, citation to authorities, or appropriate references to the record will be treated as waived."). In any event, we determine that the trial court's instructions, which we must presume the jury followed, adequately shielded the harmful effect, if any, of Ms. Buck's refusal to testify. *See, e.g.*,

*State v. Woods*, 806 S.W.2d 205, 211 (Tenn. Crim. App. 1990) (noting that the jury is presumed to follow the instructions given it by the trial court). Accordingly, we conclude that the defendant is not entitled to relief on this issue.

*VIII. Limitation of Expert Testimony*

The defendant argues that the trial court abused its discretion and impaired her right to present a defense by limiting Doctor Seyler's testimony concerning the cause of the victim's death. The State contends that the trial court correctly excluded the evidence because the defense failed to establish admissibility via Tennessee Rule of Evidence 702. Alternatively, the State argues that any error in excluding the evidence was harmless beyond a reasonable doubt because the defendant presented ample evidence that the victim died from cardiac toxicity related to her medication.

Doctor Seyler testified at trial that the victim "died as a result of toxic reaction to the medications she was on." He explained that the victim suffered from low protein levels that precluded her from effectively metabolizing the medications. Then, for the first time, Doctor Seyler stated his belief that "this child is a case of celiac disease." The State immediately objected on the basis of Doctor Seyler's testimony being "well outside any of the information communicated in [his] expert report." *See* Tenn. R. Crim. P. 16(b)(1)(B)(iii) (requiring reciprocal discovery of reports relied upon by defendant's testifying experts). In a hearing held outside the presence of the jury, the trial court commented, "If you're going to offer an opinion as to this child died of such and such – or had such and such disease, which contributed – I mean, [the State] can't prepare to defend a disease if it is never mentioned." Doctor Seyler acknowledged the absence of the celiac disease diagnosis from his expert report, but he claimed that he had just arrived at that opinion the night before testifying.

In an offer of proof, Doctor Seyler testified that in reviewing the victim's medical history, he had recently formulated the celiac disease diagnosis. He stated that he did not suspect celiac disease at any time while treating the victim and acknowledged that a 2007 letter outlining his expert opinion regarding the victim's cause of death, likewise, did not refer to celiac disease. Doctor Seyler also said that without bone marrow or intestinal testing, he could not conclusively determine whether the victim suffered from the disease.

The trial court sustained the State's objection to the testimony concerning celiac disease and found that "[i]t would be unfair as disclosed, only discovered and

postulated 36 hours ago." The trial court also ruled the celiac disease diagnosis irrelevant to Doctor Seyler's ultimate opinion that the victim died from toxic levels of her medication, in part, because Doctor Seyler could not conclusively determine the victim had celiac disease. The defendant argued that exclusion of the evidence was too extreme a sanction. *See* Tenn. R. Crim. P. 16(d)(2) (outlining sanctions for failure to comply with discovery). The trial court reiterated

> I think in this case [exclusion] is exactly the right resort. I[] think it's terribly improper to allow a new diagnosis of a disease that caused this child's death 36 hours before trial when she has been deceased for almost coming up on four years.

When the trial resumed, Doctor Seyler testified that the victim died from toxicity of her medications, that she was not strangled, and that she was not abused.

Regarding criminal procedure discovery rules, there is no mandatory exclusion that follows a violation. Criminal Procedure Rule 16(d)(2) provides,

> **Failure to Comply With a Request.** If a party fails to comply with this rule, the court may:
>
> (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms or conditions;
>
> (B) grant a continuance;
>
> (C) prohibit the party from introducing the undisclosed evidence; or
>
> (D) enter such other order as it deems just under the circumstances.

Tenn. R. Crim. P. 16(d)(2). Indeed, exclusion is disfavored.

> [E]vidence should not be excluded except when it is shown that a party is actually prejudiced by the failure to comply with the discovery order and that the prejudice cannot be otherwise eradicated. *See* Rule 16(d)(2). The exclusionary rule should not

be invoked merely to punish either the State or the defendant for the deliberate conduct of counsel in failing to comply with a discovery order. The court's contempt powers should be employed for this purpose. Rules 12 and 16, as well as the other Rules of Criminal Procedure[,] were adopted to promote justice; they should not be employed to frustrate justice by lightly depriving the State or the defendant of competent evidence.

*State v. Garland*, 617 S.W.2d 176, 185-86 (Tenn. Crim. App. 1981); *State v. James*, 688 S.W.2d 463, 466 (Tenn. Crim. App. 1984); *State v. Briley*, 619 S.W.2d 149, 152 (Tenn. Crim. App. 1981).

In our view, the trial court did not abuse its discretion by excluding the opinion evidence, which was undisclosed and could not have been anticipated by the State.

With regard to the claim that the trial court's ruling deprived her of the right to present a defense, we note that although "[p]rinciples of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony" favorable to his cause, *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000)), that right is not without limits*, see id.* (citing *Chambers*, 410 U.S. at 302). Indeed, the Supreme Court has observed that "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence." *Chambers*, 410 U.S. at 302. "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Chambers*, 410 U.S. at 302). To determine whether a particular evidentiary ruling has violated a defendant's constitutional right to present a defense, a reviewing court must consider:

(1) Whether the excluded evidence is critical to the defense;

(2) Whether the evidence bears sufficient indicia of reliability; and

(3) Whether the interest supporting exclusion of the evidence is

substantially important.

*Flood*, 219 S.W.3d at 316 (citing *Brown*, 29 S.W.3d at 434-35; *State v. Rice*, 184 S.W.3d 646, 673 (2006); *State v. Rogers*, 188 S.W.3d 593, 614 (Tenn. 2006)). With these considerations in mind, we agree with the trial court's ruling that the excluded evidence was not material to Doctor Seyler's ultimate opinion that the victim died from cardiotoxicity. Likewise, we note that Doctor Seyler admitted his inability to conclusively diagnose celiac disease four years after the victim's death as well as his not making this diagnosis while treating the victim during her lifetime. These admissions, in our view, indicate insufficient reliability of the late-formed diagnosis. Accordingly, we conclude that the exclusion of the testimony did not deprive the defendant of her right to present a defense.

## *IX. Prosecutorial Misconduct*

The defendant argues on appeal that the prosecutor committed misconduct during opening statements and closing arguments by referring to the defendant as "a consummate liar" and making similar characterizations attacking the defendant's truthfulness and vouching for the credibility of the victim's brothers. The State argues that the defendant waived these issues by failing to contemporaneously object. The State also asserts that the defendant waived the issue of the propriety of the prosecutor's opening statements by failing to include the issue in her motion for new trial.

Our review of the record confirms that the defendant failed to lodge contemporaneous objections to the prosecutor's opening statement and closing argument. Likewise, she failed to include her issue regarding the prosecutor's opening statements in her motion for new trial. Accordingly, she has waived our consideration of these issues. *See* Tenn. R. App. P. 36(b) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987).

Nevertheless, pursuant to Rule 36(b) of the Tennessee Rules of Appellate Procedure, "an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial" where consideration of the error is "necessary to do substantial justice." Tenn. R. App. P.

36(b).  Before an error may be so recognized, however, it "must be 'plain' and it must affect a 'substantial right' of the accused."  *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994).  The word "'[p]lain' is synonymous with 'clear' or equivalently 'obvious.'" *United States v. Olano*, 507 U.S. 725, 734 (1993) (citing *United States v. Young*, 470 U.S. 1, 16 n.14, (1985)).  Authority to correct an otherwise "forfeited error" lies strictly "within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"  *Id.* at 732 (citations omitted).

In *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000), our supreme court adopted the definition of "substantial right" promulgated by this court in *Adkisson*.  There, we held that "a 'substantial right' is a right of 'fundamental proportions in the indictment process, a right to the proof of every element of the offense, and is constitutional in nature.'" *Adkisson*, 899 S.W.2d at 639.  Our supreme court also adopted *Adkisson's* five factor test for determining whether an error should be recognized as plain:

> "(a) the record must clearly establish what occurred in the trial court;
>
> (b) a clear and unequivocal rule of law must have been breached;
>
> (c) a substantial right of the accused must have been adversely affected;
>
> (d) the accused did not waive the issue for tactical reasons; and
>
> (e) consideration of the error is 'necessary to do substantial justice.'"

*Id.* (quoting *Adkisson*, 899 S.W.2d at 641-42).  "[A]ll five factors must be established by the record before this court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established."  *Id.* at 283.  To be reviewable as "plain," the error "'must [have been] of such a great magnitude that it probably changed the outcome of the trial.'"  *Id.* (quoting *Adkisson*, 899 S.W.2d at 642) (alteration in original).  Finally, "the burden of establishing entitlement to relief for plain error is on the defendant claiming it." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004).  With these standards in mind,

we consider whether any error attendant to the prosecutor's opening statements or closing argument qualifies as plain.

Despite the discretion afforded trial courts in determining the propriety of closing argument, judges must nevertheless take care to restrict improper argument. *State v. Hill*, 333 S.W.3d 106, 130 (Tenn. Crim. App. 2010) (citing *Sparks v. State*, 563 S.W.2d 564, 569-70 (Tenn. Crim. App. 1978)). Because of the State's unique role in a criminal case, the State, in particular, "must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." *Id.* We have consistently held that closing argument for both parties "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" *Id.* (quoting *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). Even inappropriate closing argument will not warrant a new trial unless it was so inflammatory or improper as to affect the verdict. *Id.* (quoting *Harrington v. State*, 385 S.W.2d 758, 759 (1965)). When determining the propriety of closing argument, this court considers the following factors:

> (1) The conduct complained of viewed in the context and in light of the facts and circumstances of the case[;]
> (2) [t]he curative measures undertaken by the court and the prosecution[;]
> (3) [t]he intent of the prosecutor in making the improper statements[;]
> (4) [t]he cumulative effect of the improper conduct and any other errors in the record [; and]
> (5) [t]he relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

This court has observed that there are five generally recognized areas of prosecutorial misconduct related to closing argument:

> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
>
> 2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.
>
> 3. The prosecutor should not use arguments calculated to

-48-

inflame the passions or prejudices of the jury.

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citations omitted).

In this case, the defendant contends that the prosecutor's repeated characterizations of the defendant as "a consummate liar" qualified as inflammatory statements of personal opinion justifying a reversal of her convictions. In our view, however, the prosecutor's statements do not rise to the level of plain error because the defendant has failed to establish that a "clear and unequivocal rule of law has been breached." When reviewed in context, the prosecutor's comments directly related to evidence in the record showing the defendant's willful misleading of educators and health care providers associated with the victim – the very manner in which the defendant ably hid the abuse and neglect for almost three years. Likewise, the defendant's pattern of prevarication related directly to the State's theory of how the defendant was able to accomplish the abuse and neglect of the victim culminating in her death. These comments, although numerous and plainly-stated, do not amount to plain error in this case.

*X. Sentencing Errors and Sixth Amendment Violation*

The defendant argues that the trial court imposed an excessive sentence in contravention of his Sixth Amendment rights in both the length and alignment of sentences. The State argues that the trial court properly sentenced the defendant.

When considering challenges to the length and manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Ashby*, 823

S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration" to the appropriate "factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

> In making its sentencing decision, the trial court was required to consider:
>
> (1) The evidence, if any, received at the trial and the sentencing hearing;
>
> (2) The presentence report;
>
> (3) The principles of sentencing and arguments as to sentencing alternatives;
>
> (4) The nature and characteristics of the criminal conduct involved;
>
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
>
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
>
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5).

At the May 9, 2008 sentencing hearing, L.D. testified that she lived with the defendant while in foster care at the age of five, prior to the defendant's custody of the victims in this case. She recalled that the defendant treated foster children differently than her own children and imposed the most severe discipline on the foster children in her care. She recalled the defendant's slapping her with a belt, smacking her on the mouth, and forcing

-50-

her to the ground. She said the defendant suffered from headaches and would "take it out on" the foster children. She recalled, "[S]he would have headaches and they would cause her to have a change of mood where she was aggressive and crazy."

Betsy Dunn testified at the sentencing hearing that she investigated L.D.'s claims of abuse. She said that the defendant denied using any corporal punishment on the foster children and claimed that DCS coached the children into making allegations. Although DCS was unable to substantiate any allegations to bring criminal charges against the defendant relative to L.D.'s allegations, DCS terminated the defendant's foster parent status based upon the claims. Ms. Dunn testified that had L.D. documented bruises caused by the defendant, DCS would have sought criminal charges against the defendant at that time.

At the sentencing hearing, the defendant continued to deny abusing or neglecting the victims and asked the trial court for leniency, citing to her strong work ethic and long history of employment.

The trial court sentenced the defendant to concurrent life sentences for each first degree murder conviction (Counts One and Two).[8] In addition to the life sentences, the trial court imposed concurrent sentences of 22 years' incarceration for each conviction of aggravated child abuse of a child less than six years of age and each conviction of aggravated child neglect of a child less than six years of age (Counts Three, Four, Five, and Seven).[9] The trial court imposed a sentence of three years' incarceration for the child abuse conviction (Count Six) and concurrent sentences of 10 years each for the aggravated child abuse convictions related to R.C. and D.H (Counts Eight and Nine). The trial court then ordered the sentences in Counts One through Six to be served concurrently and the sentences in Counts Eight and Nine to be served concurrently, with each set to be served consecutively to the 22-year sentence imposed in Count Seven, for a total effective sentence of life plus 32 years' incarceration.

At the December 5, 2008 hearing on the motion for new trial, the defendant successfully argued that the trial court's imposition of lengths of sentence above the

---

[8]As indicated earlier, separate sentences should not have been imposed for these offenses. Instead the jury verdicts for each count should have been merged into a single judgment of conviction for felony murder.

[9]Likewise, the jury verdicts in counts three, four and five should have been merged into a single judgment of conviction rather than concurrent sentences imposed.

presumptive minimum violated her Sixth Amendment rights.[10]  Accordingly, the trial court reduced each 22-year sentence to 20 years' incarceration, each 10-year sentence to 8 years' incarceration, and the 3-year sentence to 2 years' incarceration, for a new total effective sentence of life plus 28 years' incarceration.  The record, however, does not contain any corrected judgments reflecting this change.  On remand, the trial court is directed to enter corrected judgments reflecting the modification to sentences resulting from the motion for new trial hearing.  That being said, the record does not reflect that the trial court's imposition of sentence length violated the defendant's Sixth Amendment rights.  *See Blakely v. Washington*, 542 U.S. 296 (2004); *Cunningham v. California*, 549 U.S. 270 (2007).

As to the defendant's challenge concerning the imposition of consecutive sentences, when a defendant is convicted of multiple crimes, the trial court, in its discretion, may order the sentences to be served consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Tennessee Code Annotated section 40-35-115.  They are:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship

---

[10]  The offenses occurred from October 2001 through June 2004.  Thus, the trial court sentenced the defendant via the pre-2005 revision of the Sentencing Act.

between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b).  The existence of a single category is sufficient to warrant the imposition of consecutive sentences. *See State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997).

In this case, the trial court concluded that the defendant fit into the fourth category, that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high.  In *State v. Wilkerson*, the supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used: (1) the court must find consecutive sentences are reasonably related to the severity of the offenses committed and (2) that consecutive sentences are necessary to protect the public from further criminal conduct.  *State v. Wilkerson*, 905 S.W.2d 933, 937-39 (1995); *see also State v. Imfeld*, 70 S.W.3d 698, 707-08 (Tenn. 2002).  The court further found that the defendant engaged in a prolonged pattern of willful abuse and neglect of the victims and that partial consecutive sentencing was necessary to protect the public from further criminal conduct.

We conclude that the record supports the trial court's determination as to alignment of sentences in this case.  Furthermore, any challenge to the imposition of consecutive sentences via the Sixth Amendment does not garner the petitioner any relief. *See Oregon v. Ice*, 555 U.S. 160, 172 (2009); *State v. Allen*, 259 S.W.3d 671, 688 (Tenn. 2008) (ruling Sixth Amendment challenges inapplicable to consecutive sentencing).  Accordingly, we affirm the trial court's sentencing in this case.

*XI.  Cumulative Error*

Having considered each of the defendant's issues on appeal and concluding that the defendant is not entitled to relief for any, we need not consider the cumulative effect of the alleged errors.  *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.").

*XII. Coram Nobis Claim*

In addition to the issues raised on direct appeal, the defendant argues that the trial court erred by denying her petition for writ of error coram nobis based upon a statute of limitations bar, and she claims that the trial court should have allowed the deposition of Doctor Levy as part of a full evidentiary hearing on the writ. The State contends that the defendant failed to establish a basis to toll the statute of limitations and that, therefore, the trial court properly dismissed the petition and properly denied the defendant's motion for deposition.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999) (citation omitted). Coram nobis relief is provided for in criminal cases by statute:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

T.C.A. § 40-26-105(b) (2006); *see State v. Vasques,* 221 S.W.3d 514, 525 (Tenn. 2007).

> The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories, as are the grounds for reopening a post-conviction petition. Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. Coram nobis claims therefore are singularly fact-intensive. Unlike motions to reopen, coram nobis claims are not easily resolved on the face of the petition and often require a hearing.

*Harris v. State*, 102 S.W.3d 587, 592-93 (Tenn. 2003). The decision to grant or deny coram

nobis relief rests within the sound discretion of the trial court. *Vasques*, 221 S.W.3d at 527-28.

"The writ of error [coram nobis] may be had within one (1) year after the judgment becomes final by petition presented to the judge at chambers or in open court, who may order it to operate as a supersedeas or not." T.C.A. § 27-7-103 (2000); *State v. Mixon*, 983 S.W.2d 661, 670 (Tenn. 1999) (holding that a petition for a writ of error coram nobis is untimely unless it is brought within one year of the entry of the trial court's "final," or last, order; the time for filing is not extended by the pursuit of a timely direct appeal). Principles of due process of law, however, may preclude the use of the statute of limitations to bar a claim in coram nobis. *Workman v. State*, 41 S.W.3d 100, 103 (Tenn. 2001). "'[B]efore a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner.'" *Id.* at 102 (quoting *Burford v. State*, 845 S.W.2d 204 (Tenn. 1992)). Thus, principles of due process may intercede when, "under the circumstances of a particular case, application of the statute [of limitations] may not afford a reasonable opportunity to have the claimed issue heard and decided." *Burford*, 845 S.W.2d at 208. "Whether due process considerations require tolling of a statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness." *Harris v. State*, 301 S.W.3d 141, 145 (Tenn. 2010) (citing *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006)).

A determination of whether due process principles require tolling the statute of limitations involves this court's weighing of the petitioner's interest in having a hearing on a later-arising claim against the State's interest in preventing the litigation of stale claims. *Workman*, 41 S.W.3d at 103. In *Harris*, the Tennessee Supreme Court adopted a three-step analysis for balancing these interests:

> (1) determine when the limitations period would normally have begun to run;
>
> (2) determine whether the grounds for relief actually arose after the limitations period would have normally commenced; and
>
> (3) if the grounds for relief are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

*Harris*, 301 S.W.3d at 145 (applying standards for tolling post-conviction claims announced

in *Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995)).

Applying this analysis to the present case, the limitations period would have begun to run thirty days after the entry of the order denying the petitioner's motion for new trial on December 16, 2008. Thus, the statute of limitations would have expired on January 15, 2010. Accordingly, we agree that the June 7, 2010 petition was untimely.

Next, we must determine whether the ground alleged in the coram nobis petition arose after the statute of limitations period had expired, or in other words, whether the grounds were later-arising. The petition asserts that Doctor Levy's March 16, 2010 arrest for possession of marijuana provided the first indication that Doctor Levy may have been using marijuana at the time of the victim's autopsy and at the time of trial. The parties stipulated at the hearing that the defendant had no way of discovering Doctor Levy's marijuana use until his arrest. We conclude that the purported newly discovered evidence was later-arising.

The final step of our due process analysis requires us to determine whether the petitioner was given a reasonable opportunity to present her claims. Prior to the supreme court's opinion in *Harris*, our courts had "declined to create a specific limitations period for later-arising claims . . . [or to] set an outer limit of reasonableness for delayed filings based on such claims." *Harris*, 301 S.W.3d at 146 (citation omitted). The supreme court, however, viewed the delay in *Harris*, over six years relative to some of the coram nobis claims, as "an opportunity to clarify when delay in seeking coram nobis relief may be unreasonable as a matter of law." *Id*. The court ultimately held that Harris' delay was unreasonable and sustained the State's affirmative defense of the statute of limitations.

In the present case, however, the defendant filed her petition for coram nobis relief within three months of Doctor Levy's arrest for possession of marijuana. Accordingly, we conclude that this delay was not unreasonable and that the defendant was entitled to due process tolling.

That being said, we also agree with the coram nobis court that defendant would not be entitled to coram nobis relief.

> As a general rule, subsequently or newly discovered evidence which is simply cumulative to other evidence in the record, or serves no other purpose than to contradict or impeach the evidence adduced during the course of the trial, will not justify the granting of a petition for the writ of error coram nobis when the evidence, if introduced, would not have resulted in a

different judgment.

*State v. Hart*, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995) (citations omitted). The petition contains no allegation that Doctor Levy was impaired at the time of the victim's autopsy some six years prior to his arrest or that he was impaired when testifying at trial two years prior to his arrest. Indeed, Doctor Levy claimed during an interview concerning his arrest that he had been addicted for "a few years" prior to his arrest but that his addiction never impacted his professional life. Furthermore, we observe that the evidence of Doctor Levy's marijuana use, if any, at the time of autopsy or trial would have been inadmissible as impeachment at trial. *See State v. Hatchett*, 552 S.W.2d 414, 415 (Tenn. Crim. App. 1997) (holding that questions concerning witness's drug use as impeachment were improper via Tenn. R. Evid. 608(b)). For these reasons, we agree with the trial court that the purported newly discovered evidence would not have changed the outcome of the trial. Accordingly, we affirm the trial court's denial of the petition for writ of error coram nobis and denial of the defendant's motion to depose Doctor Levy.

## *XIII. Conclusion*

The case is remanded for the trial court to enter judgments correctly effectuating merger of offenses as outlined in this opinion and, where appropriate, reflecting the statutory minimum lengths of sentences, as corrected at the motion for new trial hearing. Further, we direct the trial court to enter judgments in Counts Eight and Nine reflecting convictions of child abuse and three-year sentences. In all other respects, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE